[Civ. Nos. 4560, 4694. Fifth Dist. June 3, 1981.]

MISSION VALLEY EAST, INC., Plaintiff and Respondent, v.
COUNTY OF KERN et al., Defendants and Appellants.

COUNSEL

Ralph B. Jordan, County Counsel, Lawrence E. Small, Carol D. Brown and John Irby, Deputy County Counsel, for Defendants and Appellants.

Marinos, Styn & Studebaker, Jeffrey N. Garland, McCormick, Barstow, Sheppard, Coyle & Wayte and Marshall Whitney for Plaintiff and Respondent.

OPINION

**FRANSON, J.—**

## INTRODUCTION

We review two judgments granting peremptory writs of mandate ordering the appellant County of Kern (hereinafter County) to pay

respondent Mission Valley East, Inc., the excess proceeds from the tax sales of seven parcels of real property. Respondent claims entitlement to the excess proceeds under Revenue and Taxation Code section 4675 which gives "[a]ny party of interest in the property at the time of the sale" the right to claim excess proceeds within a year after the sale.[1] Respondent asserts that it is the assignee of the right to collect the proceeds by reason of quitclaim deeds acquired after the tax sales from the parties who were the record owners of the parcels at the time of the sale.

For the reasons to be explained, we have concluded that the quitclaim deeds did not effect a transfer of the right to collect the excess proceeds remaining after the tax sale; accordingly, we reverse the judgments.

FACTS

On February 25, 1977, the County's tax collector, acting as agent for the State Controller, caused to be sold at a public sale, the seven parcels which are the subject of these consolidated appeals.[2] The excess proceeds from each of the sales were as follows: (1) the Berg parcel—$670.52; (2) the first Houck parcel—$672.80; (3) the second Houck parcel—$681.57; (4) the Tufty parcel—$1,335.27; (5) the MacManus parcel—$553.83; (6) the Whelton parcel—$3,452.55; and (7) the Lanyon parcel—$1,418.29. None of these parcels were sold to respondent.

---

[1]At the time relevant to this action Revenue and Taxation Code section 4675 provided in part as follows: "Any party of interest in the property at the time of sale by the state may file with the county a claim for the excess proceeds at any time prior to the expiration of one year following the execution of the tax collector's deed to the purchaser.

"The claims shall contain any information and proof deemed necessary by the board of supervisors to establish the claimant's rights to all or any portion of the excess proceeds.

"No sooner than one year following the execution of the tax collector's deed to the purchaser, and if the excess proceeds have been claimed by any party of interest as provided herein, such excess proceeds shall be distributed on order of the board of supervisors to the parties of interest in the order of priority set forth [below] ...."

Before the enactment of section 4675, which became effective January 1, 1977, any excess proceeds derived by a county from a tax sale would be retained by the county or various taxing agencies. The former owner had no right to claim excess proceeds from the sale. (*Chesney* v. *Gresham* (1976) 64 Cal.App.3d 120, 131 [134 Cal.Rptr. 238].)

[2]Appeal No. 5 Civil 4560 (superior court No. 154793) involves the County's claim for proceeds from the sale of one parcel which belonged to Hildur V. Berg before the tax sale. Appeal No. 5 Civil 4694 (superior court No. 155236) involves the respondent's claim to proceeds from the sale of six parcels, which will hereinafter be referred to by the last name of the party who owned the parcel just before the tax sale.

After the tax sale, respondent obtained quitclaim deeds from the prior owners of each parcel. Each of the quitclaim deeds provided that the former owner: "do[es] hereby remise, release and forever quitclaim to MISSION VALLEY EAST, INC., a Corporation, and do[es] hereby transfer, assign and disclaim to grantee all rights as owner of said property both before and after the tax sale, in and to the following described real property . . . ." Respondent thereafter filed claims with the County requesting the excess proceeds resulting from the sale of each of the seven parcels; the quitclaim deeds were filed in support of these claims. Each of the claims was timely filed within one year of the subject sales and each alleged that there were no other claimants.

The County denied the claims on May 25, 1978. The respondent then initiated the instant proceedings for writ of mandate. At the hearing in the superior court, the County sought to introduce declarations of two of the former landowners which recited that the grantors never intended to transfer by the quitclaim deeds any right to claim excess proceeds. Alden Houck's declaration recited that about two months after the tax sale, the Houcks received a letter from respondent's Attorney David Neal which led the Houcks to believe that their interest in the subject properties was "almost worthless" and that Neal's client had purchased the Houck's property at the tax sale. The following is a quote from that letter: "Tax Parcel Nos. 81-031-29-00-2 and 81-155-24-00-0 were sold at the tax sale in Kern County on February 25, 1977, and as you probably know there can be no redemption from a tax sale. However, there is some *residual advantage* to you and this is of interest to my client, Mission Valley East, Inc.

"*Title companies will not insure title for one year unless the owner releases his interest* and my client has authorized me to offer you $100.00 for a quitclaim and assignment of your *remaining interest.*" (Italics added.) Houck's declaration recited that as a result of the representations in Neal's letter, Houck signed the quitclaim to Mission Valley. Houck stated that he had no intent to assign excess proceeds thereby, and didn't even know he was entitled to claim excess proceeds.

A similar declaration by Adelaide M. Lanyon was also offered into evidence. Respondent objected to the introduction of both declarations on the ground that they were irrelevant. Both declarations were received by the court subject to a motion to strike. County argued that

the declarations were relevant to show the intent of the grantor at least as to the three parcels formerly owned by the Houcks and Ms. Lanyon respectively. The trial court thereafter granted the motion to strike the declarations and the exhibits attached thereto (the letter from respondent's attorney) without an explanation of reasons for the ruling.

The court did receive, however, a declaration by Max Lichty, respondent's secretary/treasurer, which evidenced an intent on the part of respondent that the subject quitclaims would transfer the right to excess tax proceeds.

The court, after two hearings on the petitions, entered findings of fact and conclusions of law. The court concluded that the County had a mandatory duty to distribute the excess proceeds pursuant to section 4675; that this section does not prohibit the assignment of the right to claim excess proceeds; that no specific words are required to effectuate a valid assignment of this right, and the language in the subject quitclaims was sufficient to manifest an intent to assign; that the grantors were parties of interest in the said properties at the time of the tax sale and respondent was an assignee of those parties of interest; and that respondent, as the sole claimant of the excess proceeds, was entitled to the excess proceeds from the sale of the subject parcels.

Judgments granting peremptory writs of mandate were entered in each of the actions and these timely appeals followed.

## DISCUSSION

■ The pivotal issue before us is whether there was a valid assignment of the right to claim the excess proceeds from the tax sale. Revenue and Taxation Code section 4675 (fn. 1, *ante*) defines who may claim excess proceeds as "part[ies] of interest in the property *at the time of sale* . . . ." (Italics added.) The statute further provides, in stating the order of priority of parties of interest: "For the purposes of this article, parties of interest and their order of priority are:

". . . . . . . . . . . . . . . . . .

"(b) Then, any person who would be established with title to all or any portion of the property sold by the state by redemption of such property *immediately prior to the sale by the state*." (Italics added.)

Appellant emphasizes the underscored language in the above quotations and argues that it excludes those parties who acquire their purported assignment *after* the tax sale. According to appellant only those parties who own the property before the sale and not their successors in interest may claim the proceeds. While appellant's argument is superficially persuasive, a careful scrutiny of the legislative history of the statute shows that appellant's interpretation violates the legislative intent of section 4675. The Legislature obviously did not deem the underscored language to be inconsistent with its intent to allow postsale assignees to claim the right to excess proceeds, because when the Legislature amended the statute in 1978 to specify how postsale assignments must be effectuated,[3] it did not delete the language on which appellant relies. The retention of this language in the statute after the provision on postsale assignments was added shows that the Legislature did not intend the language in question to preclude assignments.

Our next inquiry is whether the Legislature's addition to the statute of a paragraph governing postsale assignments in 1978 is supportive of appellant's argument that prior to the amendment postsale assignees could not claim excess proceeds. The Legislative Counsel, in explaining the 1978 amendment, has stated: "*Under existing law*, a party in interest in property which has been sold for delinquent property taxes who may claim the amount of the proceeds of the sale which exceed the amount of the taxes and certain costs *may assign* all or part of such interest, if such assignment describes the subject matter with sufficient particularity to identify the rights assigned. [¶] This bill would specify that such party in interest . . . may assign such interest only by a [written instrument stating that the right to claim excess proceeds is being assigned and indicating full disclosure]." (Stats. 1978, ch. 1084, No. 10 West's Adv. Legis. Service, p. 3648, No. 6 Deering's Adv. Legis. Service, p. 1616.)[4]

---

[3]The 1978 amendment added the following provision regarding assignment: "After the property has been sold by the state, a party of interest in the property at the time of the sale may assign his or her right to claim the excess proceeds only by a dated, written instrument that explicitly states that the right to claim the excess proceeds is being assigned, and only after each party to the proposed assignment has disclosed to each other party to the proposed assignment all facts of which he or she is aware relating to the value of the right that is being assigned. Any attempted assignment that does not comply with these requirements shall have no effect. This paragraph shall apply only with respect to assignments on or after the effective date of this paragraph." (Stats. 1978, ch. 1084, § 5, p. 3317.)

[4]By this amendment, section 4675 now prevents the type of sharp business practices which apparently occurred in the present case.

We believe the Legislative Counsel is correct that the purpose of the 1978 amendment was merely to regulate how postsale assignments must be effectuated and not to bestow the right to make a valid assignment. Assignments could already be effectuated before the 1978 amendment is evidenced by the following sentence from that amendment: "This paragraph shall apply only with respect to assignments on or after the effective date of this paragraph." This clearly implies that there could be assignments before the amendment's effective date, which did not have to comply with the new stricter requirements.

We also reject appellant's argument that the Legislature was manifesting its intent to preclude postsale assignments when a reference to successors in interest was deleted by the Senate on March 2, 1976, from the Legislative Counsel's Digest accompanying Assembly Bill No. 2352. The Legislative Counsel's Digest to Assembly Bill No. 2352 had originally stated that: "This bill ... authorizes the distribution of ... the remaining surplus proceeds to the former owner of the property, *or the successor in interest thereto* ...." Appellant claims that an intent to preclude assignment of the right to claim excess proceeds is evidenced by the fact that when the Senate amended the bill on March 2, 1976, the above underscored words were stricken from the Legislative Counsel's Digest and replaced with a phrase which made no reference to successors in interest and which reversed the order of priority for distribution. However, we conclude that the deletion of the term "successor in interest" was made only to prevent the purchaser at the tax sale from claiming any excess proceeds and not to preclude assignment.

■ Having concluded that Revenue and Taxation Code section 4675 does not preclude a postsale assignee from claiming excess proceeds, we next reach the question whether the purported assignments in the present case were effective to transfer to respondent the right to claim the excess proceeds. We hold they were not.

■ Although the general rule in California is that choses in action or other personal rights to claim money are freely assignable, nonetheless, proof of the intent to assign must be "clear and positive" to protect the obligor (here the County) from any further claim by the primary obligee. (*Cockerell* v. *Title Ins. & Trust Co.* (1954) 42 Cal.2d 284, 292 [267 P.2d 16]; cf. *United California Bank* v. *Behrends* (1967) 251 Cal.App.2d 720, 725-726 [60 Cal.Rptr. 128].) In other words, the as-

signment must describe the subject matter of the assignment with sufficient particularity to identify the rights assigned. (See 7 Cal.Jur. 3d, Assignments, § 27, p. 46.) This is where the purported assignments fail in the present case.

■ The language of the quitclaim deeds states that the assignor does "... hereby transfer, assign and disclaim to [respondent] all rights as owner of said property both before and after the tax sale, in and to the following described real property ...." (Emphasis added.) The underscored language literally restricts the assignment to whatever rights the assignor had in the real property at the time of the assignment; it does not include personal rights such as the right to claim the excess proceeds from the tax sale. Therefore, a reasonable interpretation of the assignment language is that it excludes any claim to personal property.

We presume respondent will argue vigorously that this interpretation of the assignment language contradicts respondent's purpose in obtaining the quitclaim deeds as evidenced by the declaration of its secretary/treasurer Max Lichty which was admitted into evidence by the trial court. Lichty's declaration stated that respondent intended the deeds to transfer the right to excess proceeds. However, this declaration, as well as the Houck and Lanyon declarations offered by appellant to show a lack of subjective intent to assign the right to excess proceeds, are irrelevant in interpreting the quitclaim deeds. ■ The law governing interpretation of written instruments establishes that the *subjective intent* of a party is of no moment in ascertaining the meaning of the words used in the instruments.

A deed of conveyance is a contract and subject to the usual rules of construction of contracts. (Civ. Code, § 1066; *Firth* v. *Los Angeles Pacific Land Co.* (1915) 28 Cal.App. 399, 403 [152 P. 935].) Although Civil Code section 1636 provides that a contract must be interpreted so as to give effect to the "mutual intention" of the parties as it existed at the time of contracting, it is well settled that the correct approach is to avoid the terminology of "intention" and to look for *expressed intent* under an *objective standard.* (See 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 522, p. 445, citing *Brant* v. *California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [48 P.2d 13]; see also *Blumenfeld* v. *R. H. Macy & Co.* (1979) 92 Cal.App.3d 38, 46 [154 Cal.Rptr. 652]; *First National Bank in Dallas* v. *Rozelle* (10th Cir. 1974) 493 F.2d 1196, 1201.)

On this subject, Restatement of Contracts section 230 provides: "The standard of interpretation of an [integrated contract], except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, *other than oral statements by the parties of what they intended it to mean.*"[5]

Although evidence of the parties' undisclosed subjective intent is not relevant to interpreting the meaning of the language in the quitclaim deeds, there is other extrinsic evidence which should have been admitted. In *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373], our Supreme Court ruled that the test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether the instrument appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.

██ Assuming the language of the quitclaim deeds is reasonably subject to respondent's interpretation that the parties intended to assign the right to claim the excess proceeds because the deeds assign *"all rights* as owner of said property both before *and after the tax sale"* (italics added), this merely produces an ambiguity in the meaning of the deeds in view of the language limiting the rights transferred to rights "in and to ... real property." Because of this uncertainty, we must consider evidence of the circumstances surrounding the transaction (*id.*, at pp. 38-40). The only objective extrinsic evidence of any relevance offered below as to the meaning of the assignment language is the letter from respondent's attorney to the Houcks which was referred to in the Houck and Lanyon declarations. The letter (quoted, *ante*, at p. 93) refers to the former owners' "residual advantage" and "remaining

[5]Comment a to Restatements of Contracts section 230 explains that oral statements by the parties of what they intended the written language to mean are excluded, though these statements might show the parties gave their words a meaning that would not otherwise be apparent. Such a common understanding may justify reformation, but cannot be the basis for interpretation of the contract.

interest" in the property and then states "[t]itle companies will not insure title for one year unless the owner releases his interest and my client has authorized me to offer you $100.00 for a quitclaim and assignment of your remaining interest." Any reasonably intelligent person standing in the shoes of the person receiving this letter would understand that title companies insure title to real property interests and do not insure title to personal property such as choses in action or claims for money. Title company practice in this regard is an "operative usage" or a well-known custom of which a reasonably intelligent person presumably would be acquainted. (See Rest., Contracts, § 230.) The letter from respondent's attorney therefore bolsters our interpretation of the assignment language.

Since the letters from Neal to the former property owners were part of the objective circumstances surrounding the assignments—they triggered the execution of the quitclaim deeds—it was error for the trial court to exclude this evidence.[6]

Furthermore, because there is no conflict in the extrinsic evidence which should have been received by the trial court, we are permitted to and indeed are required to *independently* determine the meaning of the language used in the deeds. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 260, pp. 4250-4251.)

In sum, we conclude the language of the quitclaim deeds and assignments does not encompass the right to claim the excess proceeds from the tax sales; the right is not described with sufficient particularity on the face of the instrument. Our interpretation is supported by the extrinsic evidence of the letters written by respondent's attorney to Houck

---

[6]Respondent's argument that the trial court could not properly consider the Houck and Lanyon declarations because the evidence was not before the board of supervisors when it refused to honor the claims for the excess proceeds, is meritless. This is a "common law" or traditional mandamus proceeding under Code of Civil Procedure section 1085, not administrative mandamus under section 1094.5. Hence, the evidence before the court is not limited to the record of the respondent tribunal, but is limited to the issues raised by the petition and the return. (*Finkle* v. *Superior Court* (1925) 71 Cal.App. 97, 104 [234 P. 432]; Cal. Civil Writs (Cont.Ed.Bar 1970) § 17.9, p. 408.) Because the letters from respondent's attorney are relevant to the meaning of the language in the deeds, a legal question, the letters were admissible.

We also reject the argument advanced by respondent in its petition for rehearing that the letter from Neal was inadmissible hearsay. This letter falls within the exception to the hearsay rule for authorized admissions of a party (Evid. Code, § 1222).

and Lanyon offering $100 for a quitclaim and assignment of all of their interests in the property so that respondent could obtain title insurance.

The judgments are reversed.

Brown (G. A.), P. J., and Hanson (P. D.), J., concurred.

A petition for a rehearing was denied June 30, 1981, and the opinion was modified to read as printed above.