Filed 12/21/23

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| VULCAN LANDS, INC., et al.,<br><br>    Plaintiffs, Cross-defendants and Appellants,<br><br>    v.<br><br>VICTORIA OLDER CURRIER et al.,<br><br>    Defendants, Cross-complainants, and Respondents. | D082234<br><br><br><br>(Super. Ct. No. CIVDS1913143) |


APPEAL from a judgment of the Superior Court of San Bernardino County, Lynn M. Poncin, Judge, and John Nho Trong Nguyen, retired judge of the Orange County Superior Court (assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.). Affirmed.

Fennemore, J. Jackson Waste, Mark A. Ostoich; Thomas Vogele & Associates, Thomas A. Vogele and Timothy M. Kowal for Plaintiffs, Cross-defendants and Appellants.

Spach Capaldi & Waggaman, Madison S. Spach, Jr., Shaheen A. Etemadi; Reich Radcliffe & Hoover, Marc Gene Reich and Adam T. Hoover for Defendants, Cross-complainants and Respondents.

In the 1950's and 1960's, landowners in southwest San Bernardino County transferred 19 parcels of land to various individuals by grant deed, reserving a partial interest in "all oil, gas, and other hydrocarbons and minerals" beneath the surface. Once severed, the surface and mineral estates changed hands over the years. The current owners of the surface estate are mining companies that wish to extract sand and gravel from the combined 196-acre tract called Area Q through open-pit excavation. Mineral rights holders (descendants of the original grantors) claim a one-half interest in their mining proceeds.

At issue in this appeal is whether "minerals" in the original reservations include rights to mine sand and gravel. Concluding they do, the trial court granted summary judgment and entered judgment in the mineral rights holders' favor. The mining companies appeal, claiming *Bambauer v. Menjoulet* (1963) 214 Cal.App.2d 871 (*Bambauer*) establishes that sand and gravel are not minerals as a matter of law. With open-pit mining rendering the surface unusable for decades, they maintain the original parties could not have intended otherwise in severing the mineral and surface estates.

As we explain, our aim is to uncover the intent of the original grantors and grantees; neither a dictionary definition of "minerals" nor constructions of that term in statutes or past cases are dispositive. While our record is sparse, the mineral rights holders established through evidence that sand and gravel had been mined in the region for decades before the grant deeds. It is undisputed that sand and gravel possess commercial value. While open-pit mining over the next 30 years will affect usability of the surface estate, it does not render the conveyance a nullity where the surface estate retains and can profit from a 50 percent interest in the extracted minerals. At most, anticipated surface destruction through open-pit mining merely creates an

ambiguity that Civil Code section 1069 resolves in favor of the mineral rights holders.  Concluding *Bambauer* does not compel a different result, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Vulcan Lands, Inc. (Vulcan), CalMat Co. (CalMat), and Arundel Company, LLC (Arundel) are the fee simple owners of 19 plots of real property in San Bernadino County.[1]  Each parcel is burdened by reservations contained in original grant deeds executed between 1953 and 1964.  The grantors severed the surface estate from the mineral estate, reserving for themselves a one-half interest of " 'all oil, gas and other hydrocarbons and minerals now or at any time hereafter situated therein and thereunder or producible therefrom . . . together with the free and unlimited right to mine, drill and bore . . . .' "[2]

Seeking to excavate sand and gravel through open-pit mining operations on the combined tract, the mining companies filed suit to quiet title and obtain declaratory relief.  They claimed the mineral reservations did not cover sand and gravel because those materials lacked a definite chemical composition, and their removal would significantly impair the surface estate.  Current mineral rights holders Victoria Older Currie, Nancy Wood Yarborough, Catherin Older Lapat, Robert M. Older, and Deena Rae Ortiz

---

[1]    We refer to the three companies collectively as the mining companies.

[2]    One grant deed differs from the rest.  In parcel No. 0262-211-06 (the sole property owned by plaintiff Arundel), a 1958 grant deed may have reserved a 100 percent interest in "all oil, gas, and other hydrocarbons" without any reference to minerals.  While this appears in the recorded legal description for the property, the original deed is illegible, and no claim is made that it does not convey mineral rights or should be interpreted differently from the others.

(collectively, the Olders) filed a cross-complaint for declaratory relief that sand and gravel *were* covered by their mineral reservations. As they state on appeal, "[T]here is no question that the Property will be used for mining sand and gravel; the only question is whether the *profits* of the mining must be shared with [the Olders]."

Each side filed motions for summary judgment. The mining companies did not submit any evidence with their motion. The Olders filed two counsel declarations in support of their motion and requested judicial notice of certain exhibits.[3] Attorney Marc Reich prepared a table summarizing the mineral rights reservations in each of the grant deeds. Attorney Shaheen Etamadi filed a declaration authenticating discovery evidence bearing on the scope of the mineral reservation.

First, Etamadi attached the mining companies' discovery responses, in which they admitted lacking documentary or testimonial evidence of the original parties' intent as to sand or gravel mining rights. They further admitted that the parcels were located near their existing Cajon Creek mine and an ancient stream called Lytle Creek, and that sand and gravel were extracted through mining.

A planning commission report attached to Etamadi's declaration described the proposed project. The mining companies wished to develop a 196-acre combined tract called Area Q into an open pit quarry to mine sand and gravel over a 30-year period. A map situates Area Q in the southwest corner of San Bernardino County (outlined below in blue):

---

[3]     The mining companies' objections to the Olders' documentary evidence and request for judicial notice were overruled, and the court's ruling in that regard is not challenged on appeal.

4



A zoomed in map depicts the site near Cajon Wash and Lytle Creek Wash:



As will be discussed, the mining companies proposed removing a two-foot layer of topsoil and subsoil before commencing open-pit mining to a depth of 120 feet.

Other documents attached to Etamadi's declaration described the history of mining operations in San Bernardino County. A 1995 Department of Conservation, Division of Mines and Geology report authored by Dinah Shumway (Shumway report) explained that "[s]and and gravel has been

5

produced from various locations in Southwestern San Bernardino County since the early 1900s." Specifically, the Lytle Creek area had been mined since 1922 for aggregate material. Shumway noted that nearby Cajon Creek "has been noted as an alternative source of aggregate." Along similar lines, a 1999 conservation study coauthored by Vulcan employee Douglas Sprague (Sprague report) stated that before CalMat acquired its property near Cajon and Lytle Creeks in the mid-1980s, that site "had been mined by several companies since the 1920s" and had historically supplied "construction aggregate materials."[4]

The two sides disagreed on the law. Citing *Bambauer, supra,* 214 Cal.App.2d 871 and *Geothermal Kinetics, Inc. v. Union Oil Co.* (1977) 75 Cal.App.3d 56 (*Geothermal Kinetics*), the mining companies urged the court to consider three factors: (1) whether the substance had a distinct chemical composition apart from the earth; (2) whether its removal would destroy the surface estate and render the land conveyed useless; and (3) whether the substance had commercial value. They maintained *Bambauer* established a categorical rule that sand and gravel are not minerals based on the first two factors, and that out-of-state cases were in accord.

By contrast, the Olders argued Civil Code section 1069 required that reservations in deeds be construed in favor of the *grantor* and faulted

---

[4]    Other materials proffered by the Olders are less probative of the original parties' intent and do not factor into our analysis. For instance, Etamadi's declaration authenticated inspection reports in which the mining companies themselves described sand and gravel on preprinted forms as minerals. Several attachments suggested that sand and gravel had commercial value, but this was not in dispute. Other exhibits provided dictionary definitions of the word "mineral" or construed that term as it pertained to later provisions in the San Bernardino 2007 Development Code or Surface Mining and Reclamation Act of 1975 (SMARA; Pub. Res. Code, §§ 2710–2795).

6

*Bambauer* for not citing that statute.[5]  They maintained *Bambauer*'s chemical composition test had been "expressly rejected" in *Pariani v. State of California* (1980) 105 Cal.App.3d 923 (*Pariani*).  In addition, they offered dictionary and statutory definitions of the word "mineral" and its common usage to claim sand and gravel were included.  As to the mining companies' argument that open-pit mining would destroy the surface, the Olders argued that subsequent legislation required eventual surface reclamation.[6]

The parties appeared before Judge Lynn Poncin in August 2021.  They agreed there was no direct evidence of the original parties' intent and that sand and gravel had commercial value.  But the mining companies believed the deeds unambiguously did *not* reserve mineral rights in sand and gravel where these substances were indistinguishable from the earth and could not be removed without destroying the surface estate.  In the companies' view, section 1069 "only comes into play if there's an ambiguity," and none existed here.  Later legislation requiring surface restoration could not, in their view, affect the analysis.  By contrast, the Olders argued sand and gravel were substances that could be mined, and surface destruction was implied in the reservation of the right to not only extract but also explore for minerals.

Following the hearing, Judge Poncin granted the Olders' motion for summary judgment and entered judgment in their favor on the complaint and cross-complaint.  In a detailed decision, she explained that dictionary

---

[5]     Civil Code section 1069 states in relevant part:  "A grant is to be interpreted in favor of the grantee, except that a reservation in any grant . . . is to be interpreted in favor of the grantor."  Further statutory references are to the Civil Code.

[6]     Passed in 1975, SMARA requires mining companies to submit reclamation plans to obtain permit approval.  (Pub. Res. Code, §§ 2770–2774.)

7

and statutory definitions only went so far because the word "mineral" had to be construed based on the intent of the parties to a particular deed. Drawing from *Bambauer*, *Geothermal Kinetics,* and *Pariani*, the court reasoned that "for sand and gravel to be a mineral [*sic*], they would need to (i) be commercially valuable, (ii) involve a substance or resource distinct from the surface soil, and (iii) be able to be extracted without rendering the land useless or destroying the surface." On balance, the court believed the Olders' evidence addressed these factors. To the extent their proffer was lacking, section 1069 would compel construing the mineral reservations broadly to encompass sand and gravel. The court observed that *Bambauer* did not apply section 1069, and further reasoned that *Geothermal Kinetics* supported a functional approach that granted to the mineral estate the right to extract valuable resources from the earth. Based on the foregoing, the court: (1) denied the mining company's motion for summary judgment on the ground that it lacked evidentiary support; and (2) granted the Olders' motion for summary judgment.

## DISCUSSION

The purpose of summary judgment is to "cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) Summary judgment is proper if there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review the grant of summary judgment de novo, "considering all of the evidence the parties offered in connection with the motion (except that which the trial court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)

8

Because we review "the ruling, not the rationale," we may affirm summary judgment on a different basis than the trial court. (*Salazar v. Southern Cal. Gas Co.* (1997) 54 Cal.App.4th 1370, 1376.)

As we explain, the mining companies admitted they lacked documentary or testimonial evidence as to the original parties' intent in creating the mineral reservations. The undisputed evidence reflects that sand and gravel have commercial value, can be mined, and in fact have been mined in the area since the 1920's. While the mining companies place great weight on the fact that open-pit mining would render the surface estate unusable, the mineral reservations here are only partial, such that the surface estate is not left holding nothing. Moreover, this factor at most creates an ambiguity that section 1069 resolves in the Olders' favor. For these reasons, the court properly granted summary judgment in favor of the Olders.

A.     *General Framework for Construing Mineral Reservations*

Before turning to the record, we start with the legal framework. Courts use a variety of tests and interpretive aids to define the scope of a general mineral reservation in a deed. Dictionary, statutory, or case law definitions are unhelpful because the word "mineral" has no fixed meaning, and our aim is to determine the intent of the original parties. Extrinsic evidence may bear on that question by speaking to the history of local mining or the intended use of the conveyed property. Absent evidence of specific intent, mineral reservations must be construed to effectuate the most reasonable intent of the grantor in severing the mineral estate from the surface estate. As the trial court suggested, relevant factors include whether the substance in question has some distinct chemical composition or commercial value, and whether its extraction would harm the surface estate. Section 1069 creates a

9

rule of construction where ambiguity persists, requiring reservations to be construed in favor of the *grantor*. No single factor is determinative, and our overriding objective remains to effectuate the contracting parties' intent.

      1.     *The overarching goal is to discern the original parties' mutual intent, first by resort to the plain language and by considering extrinsic evidence where the plain language is ambiguous.*

"The owner of real property may divide his lands horizontally as well as vertically, and when he conveys the subsurface mineral deposits separately from the surface rights, or reserves them from a conveyance of such surface rights, he creates two separate fee simple estates in the land, each of which has the same status and rank." (*Nevada Irrigation Dist. v. Keystone Copper Corp.* (1964) 224 Cal.App.2d 523, 527.) Where the surface and mineral estates have been severed, a conveyance of one does not transfer title to the other. (*Ibid.*)

The grant deeds to the parcels in question include a reservation covering a partial interest "of all oil, gas and other hydrocarbons and minerals now or at any time hereafter situated therein or thereunder or producible therefrom, together with the free and unlimited right to mine, drill and bore on and beneath the surface of said land" for purposes of development or removal of such substances. The crucial question is whether "minerals" was meant to include sand and gravel.

Land grants are subject to the usual rules of contract interpretation, unless otherwise specified. (§ 1066.) The goal is to determine the mutual intent of the parties to the original deeds at the time of conveyance. (§ 1636.) As with any contract, we start with the express language in the deeds. (§§ 1638, 1639.) Terms in a contract may be construed in relation to the circumstances under which the contract was made. (§ 1647.) We aim to determine the parties' expressed intent under an *objective* standard—i.e.,

10

what the reservation would mean to a reasonably intelligent person aware of the circumstances. (*Mission Valley East, Inc. v. County of Kern* (1981) 120 Cal.App.3d 89, 97−98.)

As the trial court noted, the term "mineral" is a general one that "is not capable of a definition of universal application" but instead must be interpreted according to its context and usage. (*Pariani, supra,* 105 Cal.App.3d at p. 934.) Dictionary definitions are generally unhelpful for this purpose. (See *Northern P. R. Co. v. Soderberg* (1903) 188 U.S. 526, 530 ["The word 'mineral' is used in so many senses, depending on the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case."].) Ambiguity permits resort to extrinsic evidence to prove a meaning to which contractual language is reasonably susceptible. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37.)

> 2. *We first attempt to discern the parties' specific intent.*

In construing the scope of a deed reservation, courts give preference to a particular intent over a general one. (*Geothermal Kinetics, supra,* 75 Cal.App.3d at p. 60.) Where a deed is ambiguous as to the parties' intent, extrinsic evidence might clarify the parties' *unstated* specific intent. For example, courts may consider evidence of contemporaneous community knowledge—"whether the substance was known to exist within the area, whether it had value upon extraction at that time in that locale, and whether it had been developed or used in the region." (Fiske & Linford, 3 Am. Law of Mining (2d ed.) § 84.02[2][a] (hereafter American Law of Mining) [cautioning, however, that a search for contemporaneous community knowledge can turn into "a chartless voyage"].)

11

Previous mining on the property may likewise bear on the parties' specific intent. "If a particular substance, or one similar to it, has been extracted from the land, a court may conclude that the parties must have had it in mind and, consequently, intended that it be included within the mineral severance." (Am. Law of Mining, *supra*, § 84.02[2][c]; see, e.g., *Cole v. Berry* (Miss. 1962) 147 So.2d 306, 309 [bentonite was a "mineral" where it had been mined and processed in that county "long prior" to execution of the deed and was considered a mineral at the time].)

The parties' contemporaneous actions and use of the property might also clarify the parties' intent. (McCurdy, 13 Agricultural Law, § 126.03[7][g][iv] (hereafter Agricultural Law).) In determining the meaning of a general mineral reservation, "regard may be had not only of the language of the deed, but also to the situation of the parties, the business in which they were engaged and the substance of the transaction." (*Witherspoon v. Campbell* (Miss. 1954) 69 So.2d 384, 386 (*Witherspoon*) [grantee engaged in farming, and grantor was not involved in construction work for which a mineral reservation covering sand and gravel might be useful]; see *West Va. Dep't. of Highways v. Farmer* (W.Va. App. 1976) 226 S.E.2d 717, 719, 720 (*West Virginia*) [where surface estate's predecessor was unaware of any sale of sand or gravel and purchased and used the land for farming, it seemed remote that a general mineral reservation would include sand or gravel].)

Finally, specific intent may be discerned using relevant interpretive aids. Although grants are generally construed in favor of the grantee, in this state, "[A] *reservation* in any grant . . . is to be interpreted in favor of the grantor." (§ 1069, italics added.) This rule is applied not in a vacuum but

consistent with the overriding objective to ascertain the parties' true intent. (*Main v. Legnitto* (1964) 230 Cal.App.2d 667, 677–678.)[7]

### 3. *If evidence of the parties' specific intent does not resolve the issue, we turn to general intent, utilizing tests from key cases.*

Where a mineral reservation in a deed does not express any specific intent, "the general intent of the reservation controls." (*Pariani, supra,* 105 Cal.App.3d at p. 931.) Both sides rely on *Bambauer, Geothermal Kinetics,* and *Pariani* to offer competing interpretations of the general intent underlying the mineral reservations here. As the trial court noted, those cases direct courts to evaluate the chemical composition of the material (as distinct from the surface soil) and its commercial value, as well as whether extraction would destroy the surface. Because the parties read these cases differently, we explore them in detail.

### i. Bambauer *considered whether the substance has a distinct chemical composition.*

In *Bambauer*, a grantor conveyed her 640-acre parcel in Merced through a 1919 deed that reserved "an undivided one-half interest . . . in and

---

[7] Another common rule of construction, *ejusdem generis*, directs courts to construe general words in a deed in conjunction with specific ones. "[I]f general words follow an enumeration of specific substances, the general words will not be construed to their widest extent, but will be limited in application to only substances of the same general kind or class as those specifically mentioned." (Am. Law of Mining, *supra,* § 84.02[1][a].) An argument could be made that a reservation of "oil, gas, and other hydrocarbons and minerals" limits "minerals" to the types of energy-producing sources specifically mentioned (oil, gas, hydrocarbons). (See, e.g., *West Virginia, supra,* 226 S.E.2d at pp. 719–720; *Holloway Gravel Co. v. McKowen* (La. 1942) 9 So.2d 228, 232–233.) But the mining companies never made such an argument, nor could they given their position that gold *would* be covered under the mineral reservations.

13

to all mineral, and oil rights." (214 Cal.App.2d at p. 872.) The land had been used for agricultural purposes (cattle and sheep rearing) and contained substantial gravel deposits with commercial value. (*Ibid.*) The surface estate holder signed a contract with a third party granting it the exclusive rights to mine gravel deposits in a portion of the land, and the mineral estate owner (the original grantor) sued for declaratory relief. (*Ibid.*) At trial, the mineral estate owner presented no evidence. The surface estate owner examined an engineering geologist who opined that gravel deposits could be found to a depth of 12 feet in at least a 200-acre area. (*Ibid.*) In concluding the reservation did not encompass sand and gravel, the trial court was swayed by the fact that excavating a 12-foot-deep hole over this expanse "would render the land useless for agricultural purposes." (*Ibid.*)

On appeal, the court noted that other jurisdictions had applied a surface destruction test to conclude that mineral rights to agricultural land could not include gravel. (*Bambauer, supra,* 214 Cal.App.2d at pp. 872−873.) But that test had not been applied by California courts, and cases involving gold (which indisputably was a mineral) held that "the right to remove minerals reserved by a grantor will not be enjoined solely because it may result in destruction of topsoil." (*Id.* at p. 873; *Yuba Inv. Co. v. Yuba Consol. Gold Fields* (1920) 184 Cal. 469, 480−481 [mineral estate was "entitled to extract the precious metals therefrom, even though the effect thereof is to wholly destroy the surface"]; *Trklja v. Keys* (1942) 49 Cal.App.2d 211, 213 [placer mining operations that used hydraulic mining to extract gold from gravel deposits were permitted even if they necessarily destroyed the surface ground].)

The court observed that resort to general classifications of matter as animal, vegetable, or mineral "leads to the absurd conclusion that the soil

14

itself would be reserved, and the conveyance nullified." (*Bambauer, supra,* 214 Cal.App.2d at p. 873.) Left searching for some test to rationally construe the mineral reservation, the court credited the testimony of the surface estate owner's expert witness. (*Ibid.*) Because gravel deposits had no definite or uniform chemical composition by which they could be easily distinguished from the earth itself, the court concluded they were not reserved "minerals." (*Id.* at pp. 873–874; see *Psencik v. Wessels* (Tex. App. 1947) 205 S.W.2d 658, 661 [" 'There is nothing constant in the character of commercial gravel by which to identify it as a mineral, except that it consists of broken fragments of rock mingled with finer material, such as sand and clay. Nothing can be said of its chemical composition as can be said of the minerals.' "]; see also *W.S. Newell, Inc. v. Randall* (Ala. 1979) 373 So.2d 1068, 1070 ["Although there is no precise definition of the term 'mineral,' it necessarily implies a substance rare and exceptional in character possessing special value[,] something other than the soil itself."].)

> ii. Geothermal Kinetics *evaluated whether the substance had commercial value and whether extraction would cause surface destruction.*

A 1951 deed in *Geothermal Kinetics* conveyed real property in Santa Rosa but reserved to the grantor the right to mine "all minerals in, on or under" the property. (75 Cal.App.3d at p. 58.) After the mineral rights holder's lessee drilled a well, a dispute emerged as to whether geothermal energy was a "mineral." (*Ibid.*) Ultimately, the court adopted a " 'functional' approach which focuses upon the purposes and expectations generally attendant to mineral estates and surface estates," eschewing a "mechanistic approach based upon textbook definitions of the term mineral." (*Id.* at p. 59.) Applying this test, it concluded geothermal resources belonged to the mineral estate. (*Id.* at pp. 59, 62, 64.)

15

Commercial geothermal exploration did not start in the region until 1955, after the deed was executed. (*Geothermal Kinetics, supra,* 75 Cal.App.3d at p. 59.) It did not matter that the original parties did not know about the presence or use of the geothermal resources. (*Id.* at p. 61.) Examining "both the broad purpose of the 1951 conveyance of the mineral estate and the expected manner of enjoyment of this property interest," the court concluded that geothermal resources belonged to the mineral estate. (*Id.* at p. 64.) "A principal purpose of this conveyance was to transfer those underground physical resources which have commercial value and are not necessary for the enjoyment of the surface estate." (*Ibid.*) "The parties to the 1951 grant had a general intention to convey those commercially valuable, underground, physical resources of the property. They expected that the enjoyment of this interest would not destroy the surface estate and would involve resources distinct from the surface soil." (*Id.* at p. 62.) There was no expressed specific intent to the contrary, geothermal resources therefore belonged to the mineral estate. (*Id.* at pp. 62, 64.)

*Geothermal Kinetics* holds that where the specific intent of a mineral reservation cannot be discerned, courts should take a functional approach that considers the general objective of the conveyance. In *Geothermal Kinetics*, that general purpose was to transfer commercially valuable underground resources whose extraction would not destroy the surface estate.[8]

---

8 Several out-of-state cases likewise look to a material's commercial value and the potential surface destruction caused by its removal in construing mineral reservations. (See, e.g., *Farrell v. Sayre* (Colo. 1954) 270 P.2d 190, 192–193 (*Farrell*) [mineral reservation excluded sand and gravel because they had no special value and formed part of the surface]; *West Virginia, supra,* 226 S.E.2d at p. 720 [where sand and gravel lay on the surface, including them in a mineral reservation would deprive surface owner

16

iii.     Pariani *applied* Geothermal Kinetics *and used section 1069 as an interpretive aid.*

*Pariani* expanded on *Geothermal Kinetics* to address a similar question, whether geothermal resources constituted "mineral deposits" reserved to the State of California under land pate nts it issued between 1949 and 1956. Each patent conveyed the surface estate but reserved to the state "all oil, gas, oil shale, coal, phosphate, sodium, gold, silver, and all other mineral deposits contained in said land." (*Pariani, supra,* 105 Cal.App.3d at p. 926 & fn. 2, italics omitted.)  The surface estate consisted of "a remote, sandy, rocky, and steep mountainous area," and its beneficial use was not significantly impacted by the wells, gathering lines, and power plants needed to produce electricity from the geothermal steam.  (*Id.* at p. 929.)

At the time the state issued the patents, the parties were unaware of subsurface geothermal resources or the possibility of power generation using geothermal steam.  (*Pariani, supra,* 105 Cal.App.3d at pp. 930, 936.)  Unable to discern the parties' specific intent in crafting the reservation, the court instead focused on their general intent, examining what they reasonably intended to be conveyed.  (*Id.* at p. 931.)  In addition, section 1069 required construing an ambiguous reservation in favor of the grantor.  (*Id.* at p. 931.)

Thus, *Pariani* focused on "the purpose of the grant or reservation in terms of the manner of enjoyment of the respective interests involved."

of beneficial use]; *Southern Title Ins. Co. v. Oller* (Ark. 1980) 595 S.W.2d 681, 683 [limestone had commercial value, but its excavation near the surface through open-pit mining would destroy the surface soil for agricultural or grazing purposes].)  As a leading treatise explains, the surface destruction test is motivated by the rationale "that parties would not intend to sever the surface and mineral estates in a manner that would allow the destruction of the surface estate without express mention.  Otherwise a reservation or grant of one estate would destroy the other." (Agricultural Law, *supra,* § 126.03[7][g][vi], fns. omitted.)

17

(*Pariani, supra,* 105 Cal.App.3d at p. 932.) As the court explained, the mineral estate could be enjoyed by extracting valuable substances, while the surface estate could be enjoyed by retaining those substances necessary for enjoyment of the surface estate. (*Ibid.*, citing Kuntz, *The Law Relating to Oil and Gas in Wyoming* (1949) 3 Wyo. L.J. 107, 112–113, reprinted (1981) 34 Okla. L.Rev. 28, 34.) It was also relevant whether mining would destroy the surface estate. (*Pariani*, at pp. 932–933.)[9]

Applying those factors to the record, the court concluded that the state had severed from the surface " 'all substances presently valuable in themselves, apart from the soil, whether their presence is known or not, and all substances which become valuable through development of the arts and sciences, and that nothing presently or prospectively valuable as extracted substances would be intended to be excluded from the mineral estate.' " (*Pariani, supra,* 105 Cal.App.3d at pp. 932, 936, citing Kuntz, *supra,* 34 Okla. L.Rev. at p. 34.) In reaching this result, the court noted that extraction of

---

9       While citing the influential law review article by Professor Kuntz, the *Pariani* court nonetheless departed from strict application of its "manner of enjoyment" test. Kuntz suggested that the only limit on a mineral estate's extraction rights was its duty to compensate the surface estate where mineral extraction would destroy the surface. (Kuntz, *supra,* 34 Okla. L.Rev. at p. 34.) "Such damages would not be measured by the value of the substance in its new use, but would be measured by the reduction in value of the land for its surface use." (*Id.* at p. 37.) Few courts have adopted this "manner of enjoyment" test wholesale, instead using it in conjunction with other tests such as the surface destruction test to determine the original parties' intent. (Am. Law of Mining, *supra,* § 84.03[2]; McCurdy, 13 Agricultural Law (2023) § 126.03[7][d].)

geothermal resources through wells would not affect beneficial use of the surface estate. (*Pariani*, at pp. 932–933.)[10]

With this framework, we turn to the record in our case.

B. *Although the record is sparse, the Olders met their moving burden on summary judgment, which the mining companies failed to overcome.*

A defendant may meet its moving burden on summary judgment by presenting evidence that would preclude a reasonable finding in the plaintiff's favor, or by showing that the plaintiff neither possesses nor can obtain evidence necessary to meet its burden of proof. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002−1003 (*Kahn*).) As we explain, the Olders did both. With the burden shifted (*ibid.*; Code Civ. Proc., § 437c, subd. (p)(2)), the mining companies failed to demonstrate any triable issue of material fact.

First, the Olders submitted evidence of historic mining operations in San Bernardino County. As the Shumway report explained, there was placer mining for gold and silver in the 1860's around nearby Lytle Creek. Portland Cement began mining limestone for cement manufacturing in the late 1890's. Sand and gravel mining operations started in southwestern San Bernardino County in the early 1900's, with "the most active production" occurring after World War I. The Lytle Creek area was one of the "principal sources" for aggregate material. Sand and gravel mining commenced in that area in

---

10    The surface estate holders relied on *Bambauer's* chemical composition test to claim geysers were not mineral deposits because they consisted of heat. (*Pariani, supra,* 105 Cal.App.3d at p. 934.) Without rejecting that test, the court explained that the geothermal resources at issue were comprised of steam, heated fluids, gases, and brines that made up a separate, depletable deposit, as distinguished from ordinary heat, energy, or water. (*Id.* at pp. 929, 935−936.) *Pariani* did not, as the Olders suggest, *reject Bambauer's* chemical composition test.

1922, and nearby Cajon Creek area had been "noted as an alternative source of aggregate." Many mining operations in the region were historically "family-owned and locally operated."

The Sprague report likewise observed that the site acquired by CalMat in the mid-1980's near Cajon and Lytle Creeks "had been mined by several companies since the 1920s" for "construction aggregate materials." As indicated by the planning commission report submitted by the Olders, the mining companies' proposed Area Q quarry is situated near the junction of Cajon and Lytle Creeks. Together, this evidence indicates that when the deeds were drafted in the 1950's and 1960's, sand and gravel mining operations in the region were longstanding and of common knowledge.

Were this the only showing, there might remain a triable issue because the mining companies could produce additional documentary or testimonial evidence of the original parties' specific intent at trial. (*Kahn, supra,* 31 Cal.4th at pp. 1002–1003.) For example, there might be evidence of the original or intended use of the properties around the time of the original conveyances. (See, e.g., *Witherspoon, supra,* 69 So.2d at p. 386; *West Virginia, supra,* 226 S.E.2d at pp. 719–720.) But such evidence concededly did not exist. The Olders submitted the mining companies' discovery responses in which they admitted they lacked direct evidence bearing on the original parties' intent regarding sand and gravel mining. (See, e.g., *Aguilar, supra,* 25 Cal.4th at p. 855 [a defendant may present "evidence that the plaintiff does not possess, and cannot reasonably obtain needed evidence" by way of "admissions by the plaintiff following extensive discovery to the effect that he has discovered nothing"].)

Because the evidence of specific intent is not dispositive, we turn to the general intent factors identified by relevant cases. The Olders furnished

evidence that sand and gravel were distinct from the topsoil. (See *Bambauer, supra,* 214 Cal.App.2d at p. 873.) In describing proposed mining operations, the planning commission report notes that "[a]pproximately 100,000 tons of topsoil and subsoil would be removed as a separated layer, approximately 2-feet thick, from the Project site." This topsoil and subsoil layer would be relocated to build a southern berm that would be landscaped to visually screen mining operations from public view, create a noise barrier, and prevent soil and wind erosion. Only after this site preparation would mining commence on the northeast corner of the site, with the companies eventually digging a 120-foot open-pit below the surface. The topsoil and subsoil would later be used to reclaim the surface after mining operations concluded.[11]

The mining companies respond that "anyone with a backyard and a shovel" would know that sand and gravel are mixed with the earth. But this truism is not *evidence* that compels a conclusion in their favor or even creates a triable issue of fact. The mining companies' reclamation plan itself suggests variability, not uniformity, of subsurface layers. Exploratory boreholes drilled across the Area Q site in 2004 revealed that the upper 30 feet consist of "clean sand with silt with some gravels and clay." Below 40 feet, "the sands appear cleaner with an increase in gravel and clean sand layers." From 120 to 150 feet below the surface is "predominantly gravel and sand; and silt with coarse gravel comprising 50% to 60% of the material." In other words, once the topsoil and subsoil were removed, the mining

_____

[11]  As an alternative, the mining companies proposed eliminating the southern berm. "Topsoil and subsoil would still be removed from the site prior to mining; however, it would be managed offsite if not used in berm construction. Specifically, the soils would be removed separately, and transported and stockpiled offsite for later use during reclamation/ revegetation."

companies would first mainly excavate sand and increasingly remove gravel the lower they mined. Although the upper topsoil and subsoil likely contained sand (and perhaps some gravel), this evidence negates a triable issue as to whether the sand and gravel to be extracted includes the surface itself.

Turning to the next factor defined by the cases, the parties do not dispute that sand and gravel possess commercial value. (*Geothermal Kinetics, supra,* 75 Cal.App.3d at p. 64.) After all, the mining companies were in the business of excavating sand and gravel for construction materials. Vulcan had mined high quality aggregate (sand and gravel) from adjacent lands in Cajon Creek and sought to shift its mining operations to the 196-acre site called Area Q when those earlier operations concluded.

As to surface destruction, the Olders presented evidence that the surface would be reclaimed after 30 years of open-pit mining was completed. The mining companies respond that legally mandated reclamation under SMARA does not bear on the original intent of the parties. We agree—not only was SMARA enacted long after the conveyances, its statutory definition "has no bearing whatever on the interpretation of deeds between private parties." (See *Bambauer, supra,* 214 Cal.App.2d at pp. 874−875.) As the mining companies suggest, open-pit mining would undoubtedly hamper use of the surface estate for agricultural or residential purposes, unlike the geothermal wells discussed in *Geothermal Kinetics* and *Pariani.* (*Geothermal Kinetics, supra,* 75 Cal.App.3d at p. 61; *Pariani, supra,* 105 Cal.App.3d at p. 933.) Were there evidence that the land was used for such purposes, that might provide a strong indication of the parties' contrary intent. Here, however, the parties agree that the subject property is vacant land.

One point the mining companies fail to note is that the mineral estate only retained partial mining rights, not complete rights to the mineral estate. This greatly lessens the mining companies' concern that interpreting the mineral reservations broadly to include sand and gravel "would destroy the value of a fee simple conveyance" or "vitiate the surface estate," rendering the conveyance "a mere nullity." (Compare *Farrell, supra,* 270 P.2d at pp. 192–193 [reservation of 100 percent of mineral rights did not include sand and gravel comprising the surface].) Construing the mineral reservation to include mined sand and gravel does not deprive the surface estate owners of any economically viable use of their property. Rather, it simply means that the owners of both estates—surface and mineral—will share in what appears to be the most and perhaps only economically viable use.

Finally, to the extent the extrinsic evidence bearing on specific and general intent leave ambiguity, section 1069 requires us to construe the mineral reservations broadly in favor of the grantors. Absent contrary indication, reservations in a grant are "to be interpreted in favor of the grantor." (§ 1069.) *Pariani* used this provision to conclude that state land patents reserving mineral rights encompassed a right to extract geothermal resources. (*Pariani, supra,* 105 Cal.App.3d at p. 931.) Likewise, we construe the mineral reservations broadly to encompass sand and gravel.[12]

---

12 We reject the Olders' invitation to overrule *Bambauer* for its failure to mention section 1069. *Bambauer* involved a deed of agricultural land "used for cattle and sheep raising." (*Bambauer, supra,* 214 Cal.App.2d at p. 872.) The mineral rights holder presented no evidence at trial as to the parties' intent. (*Ibid.*) Eschewing generic definitions that would lead "to the absurd conclusion that the soil itself would be reserved," the court credited the surface owner's evidence that gravel had limited commercial value and was

The mineral companies respond that North Dakota and Oklahoma have a similar rule of construction yet do not recognize sand and gravel as minerals. North Dakota indeed requires reservations in a grant to be construed in favor of the grantor (N.D. Cent. Code § 47-09-13), and the high court there excluded sand and gravel from a statutory mineral reservation. (*Salzseizer v. Burnsdale* (N.D. 1959) 94 N.W.2d 502, 504 (*Salzseizer*).) In Oklahoma, reservations similarly "operate in favor of the grantor" (*Hinkle v. Gauntt* (1949) 206 P.2d 1001, 1003), yet a mineral reservation was held to exclude sand and gravel. (*Beck v. Harvey* (Okla. 1944) 164 P.2d 399, 401 (*Beck*).)

But neither of these out-of-state authorities compel a different result. *Salzseizer* was a statutory interpretation case that did not apply section 47-09-13 of the North Dakota Century Code. It evaluated the reasonable meaning of "minerals" in a North Dakota statute that reserved to the state a partial share in mineral rights to *agricultural* lands. To construe its reach, the court relied on out-of-state cases to restrict minerals beneath agricultural lands to those substances that could be distinguished from ordinary soil. (*Salzseizer, supra*, 94 N.W.2d at p. 504.) Likewise, the Oklahoma Supreme Court in *Beck* cited out-of-state cases with little analysis to conclude a mineral reservation did not include sand and gravel. (*Beck, supra,* 164 P.2d at p. 401.) Neither case discussed, much less cast doubt on, a rule requiring reservations to be construed in favor of the grantor. Both relied on out-of-state cases to derive a settled meaning of "minerals" rather than focusing on the intent of the original parties. At most, these cases apply the chemical composition test in *Bambauer* and refuse to recognize as minerals substances

---

commingled with the earth. (*Id.* at pp. 873−874.) It is not clear that *Bambauer* involved any factual ambiguity requiring resort to section 1069.

24

that are indistinguishable from the surface dirt. As discussed, the Olders produced uncontroverted evidence that the sand and gravel being mined *are* distinguishable from the topsoil.[13]

Ultimately, the inquiry is not whether a survey of out-of-state cases reveals a general rule as to whether sand and gravel are reserved minerals. Nor is our job simply to apply *Bambauer* because that case also involved a claim that gravel was a reserved "mineral" right. Instead, we must examine whether the deeds in question partially assign sand and gravel mining rights to the mineral estate.

Because the plain language of the deeds is ambiguous, we consider extrinsic evidence. That evidence reveals that sand and gravel were locally mined (mainly in family-owned operations) for three decades before the grant deeds were executed. Sand and gravel are distinguishable from the topsoil and subsoil; the composition of the earth contains sand in the upper layers and increasing amounts of gravel at lower depths. The parties agree that sand and gravel are commercially valuable resources that can be mined, and this was known to property owners in the area at the time the deeds were drafted. While excavation would undoubtedly hamper the surface estate, the surface owner's 50 percent share of proceeds means it would receive compensation even if the owner of the mineral estate was the one who was conducting the mining operation. Here, of course, it is the surface owners—

---

[13]    The mining companies caution that "overruling *Bambauer* would create a policy disaster," but we do no such thing. *Bambauer* does not create a blanket rule, and we apply its standard and other interpretive aids to reasonably ascertain the intent of the parties as to the deeds at issue here. Each case will turn on its unique facts. The history of sand and gravel mining in southwest San Bernardino County and the lack of evidence that the land conveyed here was used for agricultural purposes are two key factors distinguishing *Bambauer* from this case.

the mining companies—who have chosen to conduct the mining operations that will disturb the surface estate.

Finally, the mining companies concede this is the full extent of the record and they have no additional evidence bearing on the original parties' intent.  If that leaves us with any residual ambiguity, section 1069 guides us to construe any remaining ambiguity in favor of the grantor.

On this record, there is no triable issue of material fact as to whether the mineral reservations in the grant deeds include sand and gravel. Properly finding they did, the trial court appropriately granted the Olders' motion for summary judgment and entered judgment in their favor.

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.


DATO, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.

26