[Civ. No. 26659. Fourth Dist., Div. One. Jan. 22, 1986.]

MEDICAL OPERATIONS MANAGEMENT, INC.,
Plaintiff and Respondent, v.
NATIONAL HEALTH LABORATORIES, INC.,
Defendant and Appellant.

**888**

COUNSEL

Greta C. Botka, Wesley B. Hills, Freshman, Mulvaney, Marantz, Comsky, Kahan & Deutsch and Mulvaney & Kahan for Defendant and Appellant.

R. Keith McKellogg and Wiles, Circuit & Tremblay for Plaintiff and Respondent.

OPINION

**WIENER, Acting P. J.**—Defendant National Health Laboratories, Inc. (NHL) appeals a judgment after a jury returned a special verdict favoring plaintiff Medical Operations Management, Inc. (MOM) for breach of contract in connection with forming a medical laboratory enterprise, California Medical Laboratories, Ltd. (CML).

### FACTUAL AND PROCEDURAL BACKGROUND

Frederick Spong is a physician specializing in kidney disease. NHL is a commercial laboratory headquartered in San Diego. In 1973, Spong began negotiating with NHL's controller, Hal Lawrence, to establish a physician-owned laboratory in San Diego. The proposal for the lab (CML) included a limited partnership format wherein each participating limited partner/physician would be offered a fixed number of partnership units. This was done to avoid any direct relationship between a particular doctor's use of the lab and the return on his investment, a violation of Business and Professions Code section 650. Spong was to serve as president of CML's general partner, MOM.

The plan called for CML to contract with NHL for the actual operation of the laboratory. There was to be, however, no separate CML laboratory in the physical sense. Rather, all CML testing would be performed at the existing NHL facility by NHL personnel. Spong was to become a director of the NHL lab with supervisorial responsibilities.

Spong's directorship was an attempt to avoid violating Business and Professions Code section 655.5, making it illegal for any clinical laboratory to bill any patient for a clinical laboratory service not actually rendered by that clinical laboratory or "under . . . its direct supervision," unless the patient is informed at the first time he is presented with a bill as to the name, address and charges of the clinical laboratory performing the service.

After further negotiations between Spong and representatives of NHL, the parties decided the CML doctors would contribute capital, specimen referrals, supervision and evaluative skills to the CML-NHL enterprise; NHL would contribute equipment, management administration and testing services and would receive a 46 percent share of CML's gross revenues.

Spong's attorney, J. Wiley Jones, prepared the first draft of the letter of intent between the parties reflecting these organizational decisions. Jones also prepared a limited partnership agreement, including a provision for Spong's corporation, MOM, to be the general partner of CML. A limited partnership subscription agreement and an offering circular for use in the sale of limited partnership units were also prepared by Jones. The final agreement (Agreement) between CML and NHL was executed on July 1, 1974, by Spong as president of MOM (CML's corporate general partner) and Robert Draper, president of NHL.

Although NHL was not technically a constituent entity of CML, it was NHL which undertook to market the 50 limited partnership subscriptions necessary for forming CML. These were sold within a three-month period. Although NHL had accepted CML specimens since November 1974, CML officially began doing business on February 4, 1975. On March 24, 1975, the District Attorney of San Diego County filed a civil action against Spong, MOM, CHL, NHL and others alleging price-fixing (Bus. & Prof. Code, § 16700 et seq.), rebates to doctor limited partners (Bus. & Prof. Code, § 650) and illegal billing procedures (Bus. & Prof. Code, § 655.5).

The parties settled with the district attorney. Spong and MOM then brought this action against NHL and others[1] alleging violations of state

---

[1]They also sued Spong's attorney, J. Wiley Jones and Jones' law firm, Revlon, Inc., NHL's parent corporation, and USV Pharmaceutical, another Revlon subsidiary.

antitrust laws, fraud and breach of contract.[2] The court granted NHL's motion for nonsuit on the fraud cause of action and also directed a verdict in favor of NHL as to the antitrust cause of action. The only remaining cause of action was MOM's claim NHL breached the CML-NHL agreement requiring NHL to assure the CML lab complied with certain laws applicable to clinical laboratories. MOM necessarily alleged that although the CML-NHL enterprise was illegal, it could have been structured legally. Thus, NHL's breach of its responsibility to assure legal compliance resulted in MOM's loss of profits.

The jury agreed with MOM and awarded damages of $729,000 representing the profits CML would have earned had NHL fulfilled its alleged contractual responsibility to structure a legal enterprise. NHL's motions for a new trial and a judgment notwithstanding the verdict were denied.

## DISCUSSION

### I

NHL raises several contentions regarding the alleged impropriety of the jury verdict. Chief among them is its argument the trial court erred in even submitting the question of the Agreement's interpretation to the jury.[3]

Paragraph 1.5 of the agreement provides as follows: "1.5 [NHL] shall maintain on its staff duly licensed personnel required for the operation of a clinical laboratory and shall comply with all state and federal regulations pertaining to clinical laboratories." ■ The jury was asked to interpret

---

[2]They also sued the same defendants in federal court, but the suit was dismissed for lack of subject matter jurisdiction.

[3]For the first time at oral argument following our granting of a petition for rehearing, MOM argued that NHL could not raise the contention because the record did not reflect that NHL had ever objected to the submission of the contract interpretation issue to the jury. While it is true that the objection itself does not appear on the record—counsel represents it occurred during in chambers discussions of jury instructions and special verdict forms—the record does reflect the trial judge's acknowledgment that the issue had been raised and preserved. In discussing the motion for judgment notwithstanding the verdict, which specifically argued that the issue of contract interpretation was a legal one for the court to decide, the trial judge commented: "Now let me inquire, what do you think the effect is of having sent it to the jury if we were all in error *because we all agreed to send it to the jury except Mr. Hills* [NHL's counsel], there wasn't any request for a directed verdict as to that issue by defense, so it did go to the jury, but let's assume for purposes of argument that it was error to send it to the jury. Let's assume that. What do you think the effect is . . .[?]" (Italics added.) This reference by the trial judge makes clear that NHL did in fact object to the submission of the contract interpretation issue to the jury. The fact that MOM's counsel never suggested otherwise before the trial court or in briefing to this court supports this conclusion.

this paragraph. It was instructed on the legal rules of contract interpretation. The jurors then answered "yes" to the following special interrogatory: "Issue No. 3: Pursuant to paragraph 1.5 of the contract, did the parties intend to require NHL to determine if the CML-NHL operation was in compliance with the antitrust laws and other provisions of the Business and Professions Code of the State of California?"

In *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839], the Supreme Court recognized that "there has been confusion concerning the rules for appellate review of the interpretation of written instruments . . . ." Accordingly, the *Parsons* court sought "to define the scope of such review" as follows: "The interpretation of a written instrument, even though it involves what might properly be called questions of fact, is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' and it is the instrument itself that must be given effect. It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Ibid.;* citations omitted.) The court specifically took issue with a line of cases which had held that a trial court's interpretation of a contract was binding whenever " 'conflicting inferences may be drawn' from extrinsic evidence." (*Id.* at p. 866, fn. 2, disapproving *Estate of Rule* (1944) 25 Cal.2d 1, 11 [152 P.2d 1003].) Chief Justice Traynor's opinion adopting the position he advocated in his dissent in *Estate of Rule, supra,* explained "it is only when conflicting inferences arise from conflicting evidence, not from uncontroverted evidence, that the trial court's resolution is binding. 'The very possibility of . . . conflicting inferences, actually conflicting interpretations, far from relieving the appellate court of the responsibility of interpretation, signalizes the necessity of its assuming that responsibility.' " (62 Cal.2d at p. 866, fn. 2 quoting dissenting opinion in *Estate of Rule, supra,* 25 Cal.2d at p. 17.) The rule thus emerges that it is only when the foundational extrinsic evidence is in conflict that the appellate court gives weight to anything other than its de novo interpretation of the parties' agreement. (See also *Garcia* v. *Trust Ins. Exchange* (1984) 36 Cal.3d 426, 439 [204 Cal.Rptr. 435, 682 P.2d 1100]; *Pasadena Police Officers Assn.* v. *City of Pasadena* (1983) 147 Cal.App.3d 695, 707 [195 Cal.Rptr. 339].)

■  Here the court properly admitted extrinsic evidence to aid in the interpretation of paragraph 1.5. (See *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37, 39-40 [69 Cal.Rptr. 561, 442 P.2d 641].) This evidence presented the context in which the contract arose

and described the conduct of the parties after the execution of the contract which cast light on their original intent. (See generally, 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, §§ 526 and 527, pp. 448-450.) But although the parties hotly dispute the inferences to be drawn from this extrinsic evidence, the evidentiary facts themselves are not in conflict.[4] Thus, *Parsons* requires that we review the Agreement in the context of the extrinsic evidence presented and make our own independent determination of the meaning of paragraph 1.5.

## II

The basis of MOM's entire breach of contract claim is that paragraph 1.5 imposed on NHL the responsibility for assuring the legality of the CML-NHL enterprise.[5] NHL responds that the reference to compliance "with all state and federal regulations pertaining to clinical laboratories," when read in context, can only have referred to technical regulations relating to the *operation* of the laboratory, not to all laws which might affect the laboratory enterprise including antitrust laws focusing on the *structure* of the business. Under MOM's interpretation, however, any legal violation by the CML-NHL enterprise would be the sole contractual responsibility of NHL.

We begin by observing that it would be an unusual contract which placed all responsibility for the legality *of the contract itself* on one of the contracting parties to the exclusion of the other. Where both parties are deriving benefits from a contract, one would expect they would share equally the

---

[4]Interestingly, *Parsons* discusses the circumstances under which a trial court's interpretation of a contract will be binding on the appellate court. No mention is made of a *jury's* interpretation of a written agreement. Accordingly, even had the evidence itself been in conflict, we suspect a procedure more in keeping with the rationale of *Parsons* would be for the trial court to require the jury to make special findings on the disputed issues and then base its interpretation of the contract on those findings.

[5]We consciously finesse the question of what exactly was illegal about the CML-NHL enterprise. The district attorney's allegations were never tried and the jury made no explicit finding as to the nature of the illegality but merely determined that NHL's breach of its obligations was the proximate cause of the D.A.'s suit. As previously noted, that suit alleged illegal rebates to doctors, illegal billing procedures and price-fixing in violation of various sections of the Business and Professions Code. (See *ante*, p. 889.) The trial court did rule that one paragraph of the Agreement constituted a per se price-fixing violation but NHL challenges that ruling on several grounds. There was no court ruling on any of the other possible sources of illegality.

MOM's contentions regarding the interpretation of paragraph 1.5, however, do not distinguish between the varying allegations of illegality. All of the allegations in the D.A.'s suit related to the structure of the enterprise and the relationship of the contracting parties. MOM makes the generic contention that paragraph 1.5 made NHL responsible for assuring the legality of all aspects of the CML-NHL enterprise, including questions of structure and business relationship. We proceed to determine whether the proper interpretation of the paragraph is as broad as MOM contends.

risk of the contract being declared illegal. Of course, since a contract is basically "an allocation of risks between the parties" (see *A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473, 487 [186 Cal.Rptr. 114, 38 A.L.R.4th 1]), there may be valid commercial reasons for allocating the risks of illegality in the manner alleged by MOM. We must thus determine consistent with the "objective" standard of contract interpretation (see, e.g., *Brant* v. *California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [48 P.2d 13]; *Mission Valley East, Inc.* v. *County of Kern* (1981) 120 Cal.App.3d 89, 97 [174 Cal.Rptr. 300]) how a reasonable promisor in NHL's shoes would have believed MOM understood NHL's responsibilities under paragraph 1.5. (See Civ. Code, § 1649; *Western Camps, Inc.* v. *Riverway Ranch Enterprises* (1977) 70 Cal.App.3d 714, 725 [138 Cal.Rptr. 918].)

It is a matter of common sense as well as legal rule that the interpretation of an ambiguous clause in a contract must be made in reference to the entire contract. (Civ. Code, § 1641; *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 760 [128 P.2d 665].) The concept of the whole will often give clues to the meanings of individual parts. Here, the essence of the Agreement was NHL's promise to provide laboratory services for CML in exchange for 46 percent of the gross receipts. The additional responsibilities of NHL, as outlined in the other paragraphs of article I of the Agreement, all relate to the *operation* of the laboratory for which NHL was admittedly responsible: Premises and space (¶ 1.1); equipment and fixtures (¶ 1.2); staff and billing services (¶ 1.3); supplies (¶ 1.4); bookkeeping, records and billing (¶ 1.6); licensing and certification (¶ 1.7). One is not surprised to find in the midst of these operational responsibilities the requirement that NHL be responsible for compliance with legal regulations relating to the technical operation of the laboratory. It would be far more unusual to include in this context a guarantee by NHL that the structure of its relationship with CML was not illegal.

Even the context of paragraph 1.5 itself supports a narrow interpretation of NHL's responsibilities. The first clause of that paragraph, relating to NHL's obligation to maintain a licensed laboratory staff, specifically speaks of the "*operation* of a clinical laboratory." (Italics added.) It is reasonable to assume the second clause in that same paragraph would also relate to the laboratory's operation and not to the structure of the enterprise.

Our tentative conclusions regarding the meaning of paragraph 1.5 are supported by much of the extrinsic evidence introduced which described the context in which the Agreement was drafted and the conduct of the parties after the Agreement's execution. For instance, the evidence demonstrated that the language which later became paragraph 1.5 appeared in the first

letter of intent which was drafted by Spong's attorney, J. Wiley Jones. Jones testified that the parties were concerned about the legality of a physician-owned laboratory because of legal problems encountered by a competitor, Central Diagnostics Laboratory (CDL). NHL's Lawrence provided Jones with information on CDL's structure and possible legal problems which Jones reviewed prior to drafting the letter of intent and related documents. Jones then devised a proposal for the structure of the CML-NHL enterprise which he believed would avoid the legal problems encountered by CDL.[6] Having drafted such a proposal, it seems most unlikely Jones would have inserted in the letter of intent a paragraph which either party could reasonably believe imposed on NHL the sole responsibility for assuring the legality of the enterprise structure which Jones had devised.[7]

Furthermore, following the drafting of the letter of intent which later became the Agreement, Jones also prepared various other documents related to the formation of CML which included an offering circular for the sale of CML limited partnership interests. Notwithstanding that the Agreement

---

[6]Jones testified in some detail as to his proposal:

"Q. If you can recall, would you please describe, in your own words, the proposal you designed to overcome the [CDL] problem?

"A. The proposal really is the partnership itself in terms of the way it's structured.

". . . . . . . . . . . . . . . . . . . .

"A. . . . The CML partnership was to be formed on a basis where doctors—and the offering was limited to, I believe, licensed medical doctors within the State of California—where doctors could buy partnership units. The investment by the doctor was his own decision, and it was not conditioned in any way, either conditioned precedent or subsequent to his use of any laboratory operated by the partnership.

"The financial interest that each limited partner had in that partnership was to share in any profits or losses of that partnership as a limited partner. The limited partner would receive no direct compensation for referring patients to either NHL or CML itself.

"There was no method by which the ownership of a limited partner could be modified or changed through either the redemption of his—or buying back of his limited partnership interest, or by the issuance of additional units in order to someway compensate him for using the laboratory.

"There, also, was no requirement that a limited partner refer patients to the laboratory. And that is the method by which that particular partnership was set up, which is, in my understanding, distinctive from the way in which some of the other partnerships . . . were established."

[7]MOM argues that "J. Wiley Jones' role was limited to document preparation for MOM and CML, *for final legal review and approval by NHL,* and he had no responsibility whatsoever in rendering advice regarding clinical laboratory laws." (Italics in original.) This conclusion that Jones' function was limited to that of a scrivener is simply not supported by the evidence contained in Jones' testimony. (See, e.g. *ante,* fn. 6.) It is also arguably inconsistent with allegations contained in MOM's complaint against NHL, which also included malpractice claims against Jones as an additional codefendant. (Jones settled with MOM before trial for $100,000.) MOM alleged that "DR. SPONG negotiated both of the agreements with NHL under attorney JONES' counsel and advice and both preliminary and final drafts of those agreements were, in fact, authored in substantial part and fully drawn, reviewed and approved by attorney JONES on DR. SPONG's behalf and on behalf of MOM . . . ."

with NHL containing paragraph 1.5 was attached as an exhibit to the circular, MOM as general partner represented to potential physician-limited partners as follows: "Although the General Partner believes the proposed business activity of the Partnership will comply with existing state statutes, no assurance can be given that existing or new laws will not be interpreted to preclude physician ownership of clinical laboratories." If MOM had in fact negotiated a contract with NHL which included NHL's guarantee of the legality of the enterprise structure, one would expect that information to have been disclosed to potential limited partners. In fact, given the fiduciary duties of a general partner in a limited partnership (see *Wyler* v. *Feuer* (1978) 85 Cal.App.3d 392, 401 [149 Cal.Rptr. 626]), it is arguable such disclosure would have been mandatory.

All this is only to say it is unlikely even MOM interpreted paragraph 1.5 in the manner it now argues prior to the time the District Attorney's lawsuit brought the issue of illegality to the fore. The additional extrinsic evidence relied on by MOM demonstrates that NHL took a significant interest in the legality of the enterprise structure and that MOM may well have come to rely on NHL's expertise in the clinical laboratory field but it falls well short of demonstrating that MOM could reasonably believe NHL was assuming full responsibility for the legality of the business venture.

In summary, the trial court erred in submitting the issue of the Agreement's interpretation to the jury. That issue presented solely a question of law. Addressing that question, we conclude that paragraph 1.5 of the Agreement did not impose on NHL full responsibility for assuring the legality of the structure of the CML-NHL enterprise but referred only to compliance with technical regulations relating to the operation of the clinical laboratory. In view of our conclusions, we need not address NHL's additional arguments.

DISPOSITION

Judgment reversed. The trial court is directed to enter judgment in favor of defendant National Health Laboratories, Inc.

Lewis, J., concurred.

COWETT, J.*—I concur in the majority's result. Despite my opinion that the interpretation of paragraph 1.5 as rendered by the jury and concurred

*Assigned by the Chairperson of the Judicial Council.

in by the trial court, is a tenable interpretation based upon the record before us, I agree that a more reasonable interpretation based upon the entire record is the one rendered here. Since the *Parsons* case requires us to independently interpret paragraph 1.5 from a record disclosing uncontroverted nonconflicting extrinsic evidence and the contract itself, we choose to adopt the inferences therefrom propounded by the appellant NHL rather than those inferences vigorously propounded by respondent MOM.

A petition for a rehearing was denied February 20, 1986, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied April 16, 1986.