Filed 6/28/24  Nye v. The Walt Disney Co. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| WILLIAM S. NYE et al., <br><br>    Plaintiffs and Appellants, <br><br>        v. <br><br> THE WALT DISNEY COMPANY et al., <br><br>    Defendants and Respondents. | B326567 <br><br> (Los Angeles County Super. Ct. No. BC673736) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Dalila C. Lyons, David J. Cowan, and Kevin C. Brazile, Judges.  Affirmed.

Glaser Weil Fink Howard Jordan & Shapiro, Patricia L. Glaser, Sean Riley and Elizabeth G. Chilton for Plaintiffs and Appellants.

Mitchell Silberberg & Knupp, Lucia E. Coyoca and Christopher A. Elliott for Defendants and Respondents.

_____

Plaintiffs entered into a profit participation agreement (Agreement) with defendants The Walt Disney Company and its subsidiary Buena Vista Television, LLC (Buena Vista) to jointly produce and distribute a children's television series, *Bill Nye the Science Guy* (Series). Under the Agreement, Net Profits include revenue from "Video Device" exploitation of the Series. The Agreement also contains an "incontestability" clause, which requires plaintiffs to object to defendants' participation (accounting) statements within 24 months after the date sent.

Fifteen years later, Buena Vista notified plaintiffs they had been mistakenly overpaid and demanded repayment. In response, plaintiffs suspected Buena Vista had underreported and underpaid their Net Profits over the years. Plaintiffs later requested an audit. Plaintiffs then filed this action alleging defendants committed fraud and breach of contract by failing to properly account for and pay them the amounts due under the Agreement.

The action was litigated in three phases before three different bench officers: First, the trial court summarily adjudicated most of plaintiffs' causes of action as time-barred based on the accrual doctrine and the Agreement's incontestability clause. Discovery sanctions were also imposed against plaintiffs. Second, after an Evidence Code section 402 hearing (section 402 hearing), the court determined the plaintiffs' proposed interpretation of "Video Device" was inconsistent with other terms of the Agreement. The ruling limits plaintiffs' Net Profits. Third, on the eve of the accounting trial, the court granted plaintiffs' motion to voluntarily dismiss all remaining causes of action without prejudice, including the accounting cause of action, so plaintiffs could pursue an immediate appeal. The

2

trial court granted the request. The superior court clerk entered a dismissal of the unadjudicated causes of action without prejudice. Plaintiffs later filed a judgment, from which they appealed.

On appeal, plaintiffs contend various reversible substantive and procedural errors occurred during the proceedings. For clarity and to avoid repetition, after a Background Summary, we separately address the three phases and discuss the errors that allegedly occurred. We begin with the third phase, the voluntary dismissal, to consider the issue of appealability. For reasons stated below, we conclude the judgment entered in this case is an appealable final judgment and we affirm.

## BACKGROUND SUMMARY

On March 31, 1993, Buena Vista entered into the Agreement with plaintiffs William Nye (Nye), James McKenna (McKenna), and Erren Gottlieb (Gottlieb), KCTS-TV (KCTS) and Rabbit Ears Production, Inc. (now Ablesoft, Inc.) to produce and distribute the Series together. Under the Agreement, in exchange "for certain rights" to exploit the Series, Buena Vista is to pay plaintiffs 50 percent of all contractually defined Net Profits.

The Agreement calls for plaintiffs to receive quarterly accounting statements. However, Buena Vista did not automatically send these statements until 2005, when the Series earned Net Profits.

In 2008, Buena Vista informed plaintiffs they had been overpaid due to an accounting error. Buena Vista asked plaintiffs to return the overpayments. A year later, Nye declined to return any overpayments, demanded additional information, and asserted Buena Vista had breached the Agreement. Buena


3

Vista rejected Nye's claims and advised a formal audit could be sought under the Agreement. In the meantime, Buena Vista began recouping the purported overpayments from plaintiffs' Net Profits.

Nye attempted to negotiate a resolution short of an audit. On January 8, 2014, Nye sent a formal request for an audit of Buena Vista's books and records. Because of a backlog of pending audits, Disney agreed to toll the incontestability clause and any statutes of limitation for Nye from January 8, 2014, until the audit commenced. Once the audit began on May 2, 2016, Disney agreed to continue tolling the incontestability clause and statutes of limitation through August 2017, when Nye filed suit.

The audit's June 2017 preliminary findings purportedly showed millions of dollars were underreported in the accounting statements and underpaid to plaintiffs. McKenna, Gottlieb, KCTS, and Ablesoft, Inc. never demanded an audit under the Agreement or tolling of the incontestability clause.

On August 23, 2017, Nye filed a complaint against Disney, Buena Vista, and related entities.[1] McKenna, Gottlieb, KCTS, and Ablesoft, Inc. joined Nye in the second amended complaint filed on April 2, 2018. The operative pleading, the fourth amended complaint, sets forth seven causes of action alleged by all five plaintiffs: fraudulent concealment, fraudulent misrepresentation, breach of contract, breach of fiduciary duty, accounting, breach of the covenant of good faith and fair dealing, and money had and received. Nye, alone, asserts a cause of

---

[1] The other entities named as defendants are also Disney affiliates. Although named in prior versions of the complaint, they are no longer parties to the operative pleading.

action against Buena Vista and Disney for fraudulent inducement/false promise concerning the audit.

The operative complaint includes allegations that Nye and Buena Vista agreed to toll the contractual and statutory limitations periods.

## DISCUSSION

### I.     Third Phase—Voluntary Dismissal and Appealability

#### A.     *Governing Law*

In California, the right to appeal is statutory. (*Superior Wheeler Cake Corp. v. Superior Court* (1928) 203 Cal. 384, 386; accord, *Powers v. City of Richmond* (1995) 10 Cal.4th 85, 108.) A judgment "is the final determination [in the trial court] of the rights of the parties in an action or proceeding." (Code Civ. Proc., § 577.[2]) Section 904.1, subdivision (a) authorizes an appeal from a judgment, except an interlocutory judgment. The rule codified in this statute, known as the " 'one final judgment' rule," precludes an appeal from a judgment disposing of fewer than all causes of action existing between the parties. (See, e.g., *Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1100, 1101; *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 697.) There is "a 'well-established policy, based upon the remedial character of the right of appeal, of according that right in doubtful cases "when such can be accomplished without doing violence to applicable rules." ' " (*Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 113; accord, *Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109, 1115.)

---

[2] Statutory references are to the Code of Civil Procedure unless otherwise indicated.

**B.** *Pertinent Facts*

As stated, following adverse rulings on defendants' motion for summary adjudication and section 402 hearing, plaintiffs requested a dismissal without prejudice of their surviving causes of action, including the accounting cause of action. Plaintiffs filed a "Request for Dismissal" form (Judicial Council form CIV-110) with the superior court clerk seeking a dismissal without prejudice pursuant to section 581, subdivisions (b) and (c)[3] Attached to the form was a list of the causes of action to be dismissed. Plaintiffs served defendants with the Request for Dismissal, and defendants filed objections.

The trial court scheduled an order to show cause (OSC) hearing why the dismissal should not be entered. During the hearing, plaintiffs explained they were requesting the dismissal without prejudice to facilitate an appeal from the summary adjudication and section 402 rulings. Plaintiffs repeatedly represented they would file a judgment "that terminates the case" for the court to sign.

Following the OSC hearing, the trial court issued a written order directing the superior court clerk to enter plaintiffs' request for dismissal "forthwith" on plaintiffs' previously filed form. The

---

[3] Section 581, subdivision (b) provides, in pertinent part, that an action may be dismissed: "(1) With or without prejudice, upon written request of the plaintiff to the clerk, filed with papers in the case, or by oral or written request to the court at any time before the actual commencement of trial, upon payment of the costs, if any." Similarly, subdivision (c) of the same section provides: "A plaintiff may dismiss his or her complaint, or any cause of action asserted in it, in its entirety, or as to any defendant or defendants, with or without prejudice prior to the actual commencement of trial."

clerk entered August 12, 2022, as the date of dismissal without prejudice (August 12 dismissal).  The dismissal was served on defendants.  Plaintiffs did not appeal from the August 12 voluntary dismissal.

On September 6, 2022, plaintiffs served defendants with a draft of the proposed judgment.[4]  Defendants objected to some of the language as not complying with section 577, and they put forth the revisions to be made.[5]  Defendants also asserted the section 402 ruling was not appealable.  Plaintiffs incorporated most of defendants' suggested changes.  The December 15 judgment was signed and dated by the court.  The entry of judgment was served on defendants on December 21, 2011.

The December 15 judgment references the earlier summary adjudication, section 402 ruling, and dismissal without prejudice. The judgment states (1) defendants "take nothing by their Operative Fourth Amended Complaint"; (2) the "Judgment is entered in favor of" defendants; (3) defendants shall recover from plaintiffs their costs of suit; and (4) Nye must pay Buena Vista $10,000 in discovery sanctions.

C.   *December 15 Judgment Is the Final Appealable Judgment*[6]

Defendants contend the August 12 voluntary dismissal is the final judgment.  The appeal must therefore be dismissed

---

[4] This draft is not part of the record.

[5] Section 577 reads:  "A judgment is the final determination of the rights of the parties in an action or proceeding."

[6] Defendants challenged the appealability of the section 402 ruling in their respondents' brief.  In view of the summary adjudication of most of plaintiffs' causes of action and the voluntary dismissal without prejudice of the remaining causes of

7

because plaintiffs' February 17, 2023 notice of appeal was not timely filed. (See Cal. Rules of Court, rule 8.104.)

We disagree. Prior to entry of the December 15 judgment, there was no appealable judgment or order in this matter. An order granting summary adjudication is not appealable. (*Tucker Ellis LLP v. Superior Court* (*Nelson*) (2017) 12 Cal.App.5th 1233, 1240; *Angelical Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 503–504 [generally, orders granting summary adjudication are interlocutory and not appealable].) The section 402 ruling is also interlocutory and not one of the appealable orders listed in section 904.1, subdivision (a). Nor is the August 12 voluntary dismissal a final judgment. No judgment final or otherwise is necessary to a section 581, subdivision (b)(1) dismissal. (*Lavaysse v. Superior Court of San Francisco* (1944) 63 Cal.App.2d 223, 227; see also *Gray v. Kay* (1975) 47 Cal.App.3d 562, 565.) This voluntary dismissal is a ministerial act, not a judicial act, and not appealable.[7] (*H.D. Arnaiz, Ltd. v.*

---

action, we requested supplemental briefing on whether the December 15 judgment is the final appealable judgment. (*Griset v. Fair Political Practices Com., supra,* 25 Cal.4th 688, 696 ["reviewing court has jurisdiction over a direct appeal only when there is (1) an appealable order or (2) an appealable judgment].)

[7] Section 581d provides that a court-ordered dismissal is appealable as a final judgment when it complies with section 581d: "All dismissals ordered by the court shall be in the form of a written order signed by the court and filed in the action and those orders when so filed shall constitute judgments and be effective for all purposes, and the clerk shall note those judgments in the register of actions in the case." But, the August 12, 2022 dismissal was not a court-ordered dismissal but an order directing the clerk to enter a dismissal pursuant to

*County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1364–1365; *Cook v. Stewart McKee & Co.* (1945) 68 Cal.App.2d 758, 761 ["By the clerk's entry no judicial act has been exercised from which appeal may be prosecuted"].) Because no judgment was entered on August 12, 2022, the merits of the summary adjudication and section 402 rulings were not reviewable at that time. (See § 904.1, subd. (a)(1).)

Defendants resist this conclusion. They rely heavily on our decision in *Gutkin v. University of Southern California* (2002) 101 Cal.App.4th 967 (*Gutkin*) to argue the August 12 voluntary dismissal is the final judgment. There, the plaintiff, a professor, sued a university and several individuals for unlawful termination and related claims. (*Id.* at pp. 970–971.) A motion to dismiss the individual defendants was granted after their demurrers were sustained, and the case proceeded against the university. Facing a possible motion for terminating sanctions directed at his remaining claims, the plaintiff filed a voluntary request for dismissal of his complaint without prejudice, which the superior court clerk entered. (*Id.* at p. 973.) The plaintiff later filed a notice of appeal. He then twice sought entry of a judgment of dismissal based on the trial court's orders sustaining demurrers to five of seven causes of action and dismissal of the individual defendants, as well as his own voluntary dismissal of

---

plaintiffs' previously filed request. (See *Eliceche v. Federal Land Bank Assn. of Yosemite* (2002) 103 Cal.App.4th 1349, 1359, fn. 12 [order granting request for dismissal not appealable].) The dismissal was thus not an appealable judgment under section 581d. (See *Katzenstein v. Chabad of Poway* (2015) 237 Cal.App.4th 759, 768.)

the action.  (*Ibid.*)  The court clerk rejected the plaintiff's proposed judgment of dismissal because a dismissal of the complaint had been entered and notice of dismissal given.  The plaintiff then followed with a " 'supplemental notice of appeal.' " (*Id.* at p. 973.)

On appeal, the plaintiff challenged the trial court's orders dismissing individual defendants, sustaining demurrers to five of his seven causes of action without leave to amend, and his own dismissal of the action.  (*Gutkin, supra,* 101 Cal.App.4th at p. 970.)  As no judgment had been entered, there was an issue of appealability.  We held that "even though the trial court refused to enter judgment following his voluntary dismissal of the complaint, the court's order sustaining the demurrers without leave to amend, combined with the dismissal of the action, had the legal effect of a final, appealable judgment."  (*Id.* at p. 974.)  We explained that after the court sustained the demurrers to certain causes of action without leave to amend, " 'the plaintiff's power to voluntarily dismiss those five causes of action was terminated.'  Those counts had been effectively 'tried' by the court, and a voluntary dismissal cannot be taken after 'trial' commences" within the meaning of section 581.  (*Ibid.,* citing *Wells v. Marin City Properties, Inc.* (1981) 29 Cal.3d 781, 789.)

Defendants maintain that, as in *Gutkin*, the voluntary dismissal in this case coupled with the grant of summary adjudication constitutes a final appealable judgment without the need for entry of a separate judgment.  According to defendants, plaintiffs' causes of action were disposed of in two steps:  (1) The grant of summary adjudication as to certain causes of action.  Under section 437c, subdivision (n)(1), those causes of action were "deemed to be established" and "the action shall proceed as

10

to the cause or causes of action . . . remaining"; and (2) Plaintiffs' dismissal of the remaining causes of action without prejudice to expedite an appeal, which terminated the litigation. Defendants argue plaintiffs could have appealed the summary adjudication order once the dismissal was entered.

Defendants' reliance on *Gutkin* is misplaced. It is not the template for an appealable judgment in this case for several reasons. In *Gutkin*, the question of appealability arose because there was no judgment, prompting the issue whether the demurrers and dismissal of the action together created " 'the legal effect of a judgment.' " Here, there is a final judgment, from which plaintiffs are seeking review. Additionally, a grant of summary adjudication here cannot be equated with the sustaining of a demurrer without leave to amend in *Gutkin*. The latter is considered "a trial" within the meaning of section 581 because it " 'effectually dispose[s] of the case,' " and thereby obviates the need for trial. (*Wells v. Marina City Properties, supra*, 29 Cal.3d at p. 785; *Gray v. Superior Court* (1997) 52 Cal.App.4th 165, 173.) So, as we held in *Gutkin,* combining it with a dismissal of the action would have "the legal effect of a final appealable judgment." (*Gutkin, supra,* 101 Cal.App.4th at p. 974.)

In contrast, a summary adjudication "do[es] not constitute the 'trial' which brings the action to the stage where final disposition can be made;" it is "not a trial of a question of law barring a plaintiff from voluntarily dismissing his action or a party to the action under section 581." (*Cal-Vada Aircraft, Inc.* (1986) 179 Cal.App.3d 435, 447.) A chief reason is because a grant of summary adjudication is an interim ruling, the " ' "trial court retains the inherent authority to change its decision at any

11

time prior to the entry of judgment." ' " (*Chen v. Valstock Ventures, LLC* (2022) 81 Cal.App.5th 957, 968, quoting *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1100; see § 1008, subd. (c) [allowing a court to change an order "at any time" if there has been a change in the law].) Moreover, section 437c subdivision (n)(1) does not contain an exception to the trial court's authority to modify a summary adjudication order. (*Chen,* at p. 969.) Indeed, whether the court has reconsidered its summary adjudication order, it retains authority to do so, which is sufficient to prevent the order from being final. (*Ibid.*) The order was not appealable before the December 15 judgment was entered.

## D. *Section 402 Ruling Is Reviewable*

Next, defendants contend that even if the December 15 judgment were the final judgment in this matter, it is only appealable in part. They argue plaintiffs' voluntary dismissal without prejudice precludes our review of the section 402 ruling. (*Six4Three LLC v. Facebook, Inc.* (2020) 49 Cal.App.5th 109, 113 ["A single order or judgment can be in part appealable and in part nonappealable"].)

Again, we are not persuaded. Because plaintiffs seek review of an appealable final judgment under section 906, all intermediate nonappealable orders related to the judgment are reviewable as well. (See *Lopez v. Brown* (2013) 217 Cal.App.4th 1114, 1133.) Plaintiffs argue—and defendants do not contest— that the relatedness criteria set forth in section 906 are

12

satisfied.[8]  We agree, and therefore conclude the section 402 ruling is reviewable.

Nonetheless, defendants argue we are prevented from reviewing the section 402 ruling by plaintiffs' voluntary dismissal without prejudice.  Defendants theorize such dismissals preclude plaintiffs' ability to appeal from unadjudicated causes of action as well as any interim rulings relating to them.  Instead, only those causes of action that are adjudicated—here summarily adjudicated—may be appealed.  For support, they point to *Gutkin, supra,* 101 Cal.App.4th 967, *Pollock v. University of Southern California* (2003) 112 Cal.App.4th 1416, and *Berry v. Frazier* (2023) 90 Cal.App.5th 1258.  The decisions are readily distinguishable.  Here, plaintiffs, unlike the plaintiffs in those cases, did not seek review of interim orders in an appeal from a voluntary dismissal, a judgment of dismissal, or a demurrer sustained without leave to amend combined with a voluntary dismissal without prejudice.  And, in any event, the issue is not appealability but reviewability of interim orders from the December 15 judgment, which section 906 permits.

## II.    First Phase—Summary Adjudication

### A.    *Pertinent Facts*

In May 2019, Buena Vista sought summary adjudication of plaintiffs' causes of action that "arise from or are based on" the

---

[8] Section 906 provides in part:  "Upon an appeal pursuant to Section 904.1 . . . , the reviewing court may review the . . . decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party."

individual accounting statements.  In its motion, Buena Vista characterized each statement as a separate cause of action under the continuous accrual doctrine.  Buena Vista argued most of these causes of action are time-barred by the Agreement's 24-month incontestability provision and/or the applicable statutes of limitation.  Buena Vista asserted the exact periods sought to be adjudicated varied among plaintiffs because  (1) Nye filed suit before being joined by the other plaintiffs; (2) Nye alone benefited from tolling Agreements with Buena Vista; and (3) the fraud and breach of contract claims have different statutes of limitation.  Buena Vista presented a chart depicting how the same claims were barred by different limitations periods.

In opposition, plaintiffs argued the motion for summary adjudication violated section 437(c), subdivision (f)(1) prohibiting piecemeal litigation; the accounting statements are not subject to the incontestability clause because the condition precedent was not met; under the discovery rule or continuing violation doctrine, plaintiffs' causes of action are not time-barred; and Buena Vista is estopped from asserting a contractual or statutory limitations defense.

In December 2019, the trial court agreed with Buena Vista that the summary adjudication motion was procedurally proper and the continuous accrual doctrine applied.  Thus, plaintiffs could only pursue causes of action based on accounting statements issued within the statutory limitations period or the contractual limitations period.  Causes of action accruing before those periods were time-barred.  The court also concluded the incontestability clause applied to all accounting statements for all defendants and defeats the discovery rule.  However, Buena Vista's failure to present evidence the statements were delivered

14

to plaintiffs other than KCTS meant the incontestability clause was not triggered for those statements.  The court further concluded Buena Vista prevailed on the remaining arguments and granted summary adjudication.  As a result, the extent to which plaintiffs' claims were viable depended upon the dates the accounting statements were issued; the motion for summary adjudication was granted in part.

### B. *Governing Law and Standard of Review*

#### 1. **Motion for summary adjudication**

Summary adjudication, like summary judgment, is appropriate when the moving party shows "[it] is entitled to a judgment as a matter of law" (§ 437c, subd. (c)) because, among other things, the moving party shows "there is a complete defense to the cause of action."  (§ 437c, subd. (p)(2).)  Generally, where undisputed facts establish a cause of action, barred by a statute of limitations, summary adjudication must be granted.  (See *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112; *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487.)  Because the propriety of summary adjudication and the subsidiary question of the validity of a cause of action involve questions of law, our review is de novo.  (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273.)

#### 2. **Statute of limitations**

"The limitations period, the period in which a plaintiff must bring suit or be barred, runs from the moment a claim accrues. [Citations.]  Traditionally at common law, a 'cause of action accrues "when [it] is complete with all of its elements"—those elements being wrongdoing, harm, and causation.' "  (*Aryeh v. Canon Business Solutions Inc.* (2013) 55 Cal.4th 1185, 1191 (*Aryeh*).)  Here, different statutory periods were at play:  Four

15

years for breach of a written contract, accounting, breach of covenant of good faith and fair dealing, and monies had and received (§ 337); and three years for fraud-related claims and breach of fiduciary duty or mistake (§ 338, subd. (d)).

### C. *Continuous Accrual Doctrine Solely Applies*

It is undisputed that plaintiffs' claims are based on accounting statements that had been issued since 1994. Plaintiffs have not argued, either before the trial court or on appeal, that the operative complaint alleges defendants committed wrongful acts within the applicable statutory periods. Instead, plaintiffs have maintained their claims are timely under two equitable exceptions that modify the initial accrual of a cause of action and/or the running of a statute of limitations. Those exceptions are the continuing violation doctrine and the discovery rule. At the same time, plaintiffs contend the trial court erred in applying another equitable exception, the continuing accrual doctrine.

The continuous accrual doctrine does not extend the applicable statutes of limitations. Instead, "a series of wrongs or injuries may be viewed as each triggering its own limitations period, such that a suit for relief may be partially time-barred as to older events but timely as to those within the applicable limitations period." (*Aryeh, supra,* 55 Cal.4th at p. 1192.) Application of the doctrine is generally limited to circumstances where a recurring obligation exists and each new breach of the obligation provides all the elements of a claim, which may be treated as an independently actionable wrong prompting the running of its statute of limitations. (*Id.* at p. 1199.) The doctrine limits the retroactive relief a plaintiff may gain damages

16

arising from those breaches falling within the limitations period. (*Ibid.*)

The continuing accrual doctrine applies here. Buena Vista issued accounting statements and paid plaintiffs on a recurring basis. The statements purportedly consisted of intentionally underreported payments. Buena Vista's duty to pay plaintiffs what they were owed under the Agreement was a continuing one, susceptible to recurring breaches. Thus, each alleged breach must be treated as triggering a new statute of limitations. (*Aryeh supra,* 55 Cal.4th at pp. 1200–1201; see *Tsemetzin v. Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1344 [periodic monthly rent payments owed were a recurring obligation]; *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.* (2004) 116 Cal.App.4th 1375, 1388–1389 [monthly payments on a gas and oil lease created a recurring obligation].) While some portions of plaintiffs' claims were undoubtedly time-barred, other portions were timely (1) for Nye—as to accounting statements issued within the applicable three- or four-year limitations period preceding the tolling by his audit request and (2) for the other plaintiffs—as to accounting statements issued within the three- or four-year limitations period preceding their joinder in the lawsuit.

In contrast, the continuing violation doctrine may effectively extend the limitations period for claims that are otherwise time-barred. The doctrine "aggregates a series of wrongs or injuries for purposes of the statute of limitations, treating the limitations period as accruing for all of them upon commission or sufferance of the last of them." (*Aryeh, supra,* 55 Cal.4th at p. 1192.) For the continuing violation doctrine to apply, the defendant must have engaged in "a pattern of

17

reasonably frequent and similar acts [that] may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period." (*Id.* at p. 1198.) The doctrine has largely been developed in employment discrimination and harassment cases. (See *Richards v. CH2M Hill Inc.* (2001) 26 Cal.4th 798; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028.)

Plaintiffs' principal argument is the accounting statements were interrelated as an indivisible course of conduct because they all provide " 'cumulative to date' " figures. To be sure, along with the income and expenses listed for that reporting period, the statements had a separate column or an attached "schedule" showing the "cumulative revenue and distribution costs" to date. There can be no indivisible course of conduct based on a spread sheet showing the Series' financial performance to date.

Plaintiffs fare no better in relying on the discovery rule. "The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action."[9] (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.) Suspicion triggers inquiry notice. (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1309.) "A plaintiff

---

[9] The discovery rule is codified in section 338, subdivision (d), the applicable statute of limitations for plaintiffs' fraud-related claims: "An action for relief on the ground of fraud or mistake. The cause of action in that case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." (See *Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 561–562.)

18

need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d at p. 1111.)

The record is replete with evidence that plaintiffs were on actual—and certainly inquiry—notice of the factual basis for Buena Vista's alleged breach of contract and fraud well before Nye sought the 2017 audit. Although subjective suspicion of wrongdoing is not required to show notice (*Genisman v. Carley* (2018) 29 Cal.App.5th 45, 50–51), there is uncontroverted evidence the 2008 overpayment notification caused plaintiffs to suspect Buena Vista of having repeatedly underpaid them: In depositions, Nye testified he came to believe in 2008 that plaintiffs were being "defrauded by Disney;" McKenna testified the 2008 overpayment made him "skeptical" and "suspicious" about the accounting; he thought it was Disney's excuse to forestall payment of the profits they deserved and suspected accounting problems "further back;" Gottleib testified the overpayment error was "a little weird," perhaps due to "incompetence," and raised a question whether the error was intentional; KCTS's representative testified KCTS was prompted by the overpayment notification to advise Buena Vista of its concerns about potential other accounting errors. Further, KCTS's CEO commented internally, "Are we sure they're just not taking us for something?"

Plaintiffs maintain there is a triable issue because some deposition testimony referred to the overpayment as "a 'math

19

error,' " or " 'haphazard accounting.' " The argument misses the point. Regardless of how plaintiffs characterized the overpayment, they all testified it made them suspect Buena Vista of wrongful conduct. A plaintiff discovers a cause of action "when, simply put, he at least 'suspects . . . that someone has done something wrong' to him [citation], 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding.' " (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397–398.)

## D. *Application of the Incontestability Clause Is Not Subject to a Condition Precedent*

Paragraph 19 of the Agreement contains an incontestability clause limiting the period in which plaintiffs could challenge the accounting statements. The clause provides: "Statements will be deemed conclusive, incontestable, and final 24 months after delivery, unless [Buena Vista] has received specific, detailed objections from [plaintiffs] within the specified period."

The trial court concluded the incontestability clause applied only to certain of KCTS's claims, because Buena Vista failed to show the statements had been delivered to other plaintiffs for the relevant years. Plaintiffs reject this finding, asserting Buena Vista failed to satisfy the condition precedent for the clause to apply at all. According to plaintiffs, the condition precedent is the sentence immediately preceding the incontestability clause in the same paragraph. That sentence states: " '[Buena Vista] will issue quarterly accounting statements commencing six months after the initial broadcast of the initial episode of the Series and for so long as Gross Receipts are received by [Buena Vista] hereunder.' "

20

We read the juxtaposed sentences as two related, but independent contract provisions. The first provision indicates when and for how long accounting statements will be issued. The second provision, the incontestability clause, specifies the length of time for plaintiffs to object to those statements. The plain language of each provision does not require the 24-month limitations period to be "subject to" or conditioned upon the statements' quarterly delivery. (*Minton v. Mitchell* (1928) 89 Cal.App. 361, 368.) Contrary to plaintiffs' contention, there is no link between them. No language creating a condition precedent appears here.

**E.** ***Summary Adjudication Was Not Prohibited by Section 437c, Subdivision (f)(1)***

We also find no merit in plaintiffs' contention the trial court erred in granting summary adjudication because Buena Vista's motion did not "completely dispose of a cause of action" as required by section 437c, subdivision (f)(1).[10]

---

[10] Section 437c, subdivision (f)(1) states: "(1) A party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty, if the party contends that the cause of action has no merit, that there is no affirmative defense to the cause of action, that there is no merit to an affirmative defense as to any cause of action, that there is no merit to a claim for damages, as specified in Section 3294 of the Civil Code, or that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs. A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty."

A party may move for summary adjudication challenging separate and distinct wrongful acts even though they are combined with other wrongful acts alleged in the same "theory of liability" or cause of action. Thus, summary adjudication may be granted concerning some of those wrongful acts without subverting section 437c, subdivision (f)(1) even though doing so would not dispose of the entire cause of action as pleaded. (*Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854–1855.)

As discussed, the accounting statements reflected separate and distinct wrongful acts of underpayment, some of which gave rise to causes of action that were time-barred. In *Edward Fineman Co. v. Superior Court* (1998) 66 Cal.App.4th 1110, 1116 our colleagues in Division Four held summary adjudication based upon the statute of limitations was proper despite the fact the complaint alleged multiple separate acts of unauthorized payment as the bases for causes of action, and not all of them were barred by the statute. That decision is dispositive here.

## III. Second Phase—Section 402 Hearing

### A. *Pertinent Facts*

#### 1. Terms of the Agreement on Net Profits

Plaintiffs are to receive 50 percent of 100 percent of Net Profits under the Agreement. Starting with Gross Receipts, paragraph 10 of the Agreement explains how Net Profits are calculated. Gross Receipts are defined as "all sums actually received by or credited to [Buena Vista] from all sources from the exploitation of rights to the Series."

There are two exceptions to that definition. For revenue from Video Device exploitation, paragraph 10.5.A defines Gross Receipts as "(i) all royalties received by [Buena Vista] from and

22

accounted thereto by any unaffiliated third party from the manufacture and distribution of Video Devices, less direct royalties paid to third parties, or (ii) to the extent [Buena Vista] granted to its affiliated companies the right to manufacture and distribute such Video Devices, a royalty in an amount equal to twenty percent (20%) of the sums actually received by such affiliated company (less taxes, credits, and returns) from its distribution thereof." Paragraph 10.1 defines a "Video Device" as an "audio visual cassette, video disc or any similar device embodying the Series."

Paragraph 10.5.B is a catch-all provision that defines Gross Receipts for a variety of other sources of exploitation.

Once Gross Receipts are determined, distribution fees are deducted. Paragraph 10.1 lists the amounts of distribution fees ranging from 25 percent to 40 percent. Video device distribution is subject to no distribution fee because, as indicated, that revenue is reported to Gross Receipts as a royalty of 20 percent of the amount Buena Vista affiliates receive.

Paragraphs 10.2 through 10.5 list other deductions subtracted from Gross Receipts, including advertising, promotion, taxes, and other fees and costs.

Paragraph 10 defines net profits as what remains of Gross Receipts after all the deductions.

### 2.    The section 402 proceedings

Following the ruling on the motion for summary adjudication, the trial court ordered the accounting cause of

23

action bifurcated and tried to the court first, followed by a jury trial, if necessary, on any claims that remained.[11]

The parties differed on the interpretation of "Video Device," which, as mentioned, appears in paragraph 10.1 of the Agreement. A Video Device is an "audio visual cassette, video disc or any similar device embodying the Series." The issue was whether SVOD and EST[12]distribution revenue should be treated and accounted for as Video Device distribution revenue. Buena Vista contended SVOD and EST revenue is considered as Video Device revenue, and thus has been properly reported over the years to Gross Receipts as a 20 percent royalty for the calculation of Net Profits. Plaintiff contended SVOD and EST are not Video Device revenue, and thus 100 percent of such revenue should have been reported to Gross Receipts for the calculation of Net Profits.

Pursuant to *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, the trial court initially determined plaintiffs were entitled to a section 402 hearing to present extrinsic evidence to support their view the Video Device was reasonably susceptible to different interpretations.

A four-day section 402 hearing was held. The trial court provisionally received the following evidence: Two of plaintiffs' witnesses were experts in the custom and practice of the

---

[11] As the trial court noted, although plaintiffs are not entitled to a jury trial on the accounting cause of action, they are entitled to a jury trial on damages.

[12] SVOD (Subscription Video On Demand) refers to streaming services like Netflix. EST (Electronic Sell Through) refers to Video downloads like iTunes.

entertainment industry. Steven Sills, an accountant, and David Tenzer, a transactional attorney, testified the terms "Video Device," "any similar device," would have meant a physical object in 1993, not SVOD or EST. Tenzer added the term "manufacturing" as used in the Agreement refers to physical objects being made, like a VHS tape or disc, not a digital file. The experts also distinguished between how royalties and revenue are reported in the Agreement for Video Devices and how they are currently reported for SVOD and EST. Both Tenzer and Sills testified Buena Vista should have reported all revenue from the Series under the catchall provision of Paragraph 10.5.B.

Nye testified he understood in negotiating the Agreement that Video Device meant a physical object like a VHS tape or disc distributed to consumers. There was no discussion of SVOD or EST in 1993.

Buena Vista's expert, Philip Schuman, had longstanding experience as a transactional attorney and studio executive. He testified SVOD and EST are considered a Video Device in the industry, because they are "similar devices embodying the Series." SVOD and EST are part of the continuing evolution of the technology of the consumer home video experience. A video device does not have to be a physical object. Shuman testified the term "manufacturing" does include the production of SVOD and EST.

Michael Patterson, an in-house Disney attorney, testified that paragraph 1 of the Agreement allows Buena Vista the option to "distribute and exploit all programs and adaptations of [the Series], including but not limited to television, video cassette, video disc, publishing, merchandising, licensing, and any and all other subsidiary rights of any kind whether now

25

known or hereinafter invented." Patterson testified paragraph 1 and paragraph 10.1 read together reasonably supports including SVOD and EST as Video Devices.

Jennifer Praw, a Disney accountant, testified it is Disney's custom to treat SVOD and EST as home video, akin to a video cassette or disc.

Christopher Stefanidis, a Disney vice-president, testified on the use of technology and work that goes into preparing a master file and the requirements of licensees, like Netflix.

After the hearing, the trial court found: (1) the extrinsic evidence in this "new use case" was of little assistance in divining the parties' mutual intent regarding something that did not exist at the time of the Agreement;[13] (2) the witnesses' testimony was conflicting evidence, which gave rise to credibility issues; (3) whether SVOD and EST are reasonably susceptible to the meaning of Video Device does not "turn on" those credibility issues; and (4) even if a jury favored plaintiffs' meaning, that interpretation of Video Device is inconsistent as a matter of law with other relevant terms of the Agreement.

B.    *Governing Law*

The interpretation of a written contract is a question of law for the trial court to decide unless the interpretation turns on the

---

[13] The court stated: "In sum, it is apparent that while extrinsic evidence can be provisionally received to substantiate an interpretation, ultimately such evidence is unlikely to be probative in new use cases (such as this one) to interpret the Agreement or to offer critical insight into which interpretation of an [A]greement should prevail." (Citing various out of state and federal authorities.)

26

resolution of a factual question concerning the credibility of extrinsic evidence. (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) This means the interpretation of a written contract is solely a judicial function unless the evidence creates a legitimate dispute as to the truth or falsity of a fact that is both extraneous to the contract and material to its interpretation. (*City of Hope,* at p. 395; *Parsons,* at p. 865.) If the extrinsic evidence creates such a question of fact, the jury must decide that question before the contract can be interpreted. (*Wolf v. Walt Disney Pictures & Television, supra,* 162 Cal.App.4th at p. 1127.) After the jury decides the facts, the interpretation of the contract either can be submitted to the jury or the court can interpret the contract in light of the jury's factual finding. (*City of Hope, supra,* at p. 396; see *Medical Operations Management, Inc. v. National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 892, fn. 4.)

### C. *Plaintiffs' Interpretation Is Inconsistent with Other Terms of the Agreement*

Plaintiffs argue after properly finding there was conflicting extrinsic evidence implicating witness credibility, the trial court erroneously prevented a jury from interpreting the Agreement. Plaintiffs also argue the court's wrongly rejected plaintiffs' interpretation of Video Device as inconsistent with other provisions of the Agreement. Although a jury is required to resolve witness credibility issues in interpreting a contract, such is not the case here. The trial court provisionally received extrinsic evidence to assist in interpreting the Agreement. (*Parsons v. Bristol Development Co., supra,* 62 Cal.2d at pp. 865–866.) However, the court found the evidence unhelpful. The

witnesses' testimony failed to reasonably show the parties' mutual intent in 1993 regarding something that did not exist. (Civ. Code, § 1636; *Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1111 [" 'A contract must be interpreted so as to give effect to the mutual intent of the parties' "].)  As a result, the court determined any credibility issues arising from conflicts in the testimony were not relevant. The interpretation of the Agreement did not depend on the resolution of those issues.  Thus, there was no reason to submit the interpretation of the Agreement to a jury.

Turning to the Agreement itself, the trial court concluded even if a jury were to decide plaintiffs' interpretation should prevail, it is inconsistent with other terms of the Agreement. Because the trial court interpreted the Agreement based on the four corners of the document, we review its conclusion de novo. (*Tribeca Companies, LLC v. First American Title Ins. Co., supra,* 239 Cal.App.4th at p. 1110 [where interpretation of a contract does not turn on credibility of conflicting extrinsic evidence, trial court's interpretation is a question of law, which we review independently].)

" 'Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms.' " (*Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432; see Civ. Code, §§ 1638 ["language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"], 1639 ["[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"].)  The words are to be understood "in their ordinary and popular sense" (Civ. Code, § 1644); and "[t]he whole of [the] contract is to be taken together, so as to give effect

28

to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641; *Transamerica Ins. Co. v. Sayble* (1987) 193 Cal.App.3d 1562, 1566 ["The contract must be construed as a whole, without giving a distorting emphasis to isolated words or phrases"].) Additionally, a contract must receive an interpretation that is reasonable. (Civ. Code, § 1643.)

As discussed, paragraph 10.1 of the Agreement lists distribution fees for every type of exploitation of the Series. For Video Devices, the distribution fee is 0.0 percent. This is because paragraph 10.5.A(ii) provides that Gross Receipts from Video Device exploitation are defined as "a royalty in an amount equal to Twenty Percent (20%) of the sums actually received by such affiliated company (less taxes, credits, and returns) from its distribution thereof." Essentially, the remaining 80 percent is in lieu of a deduction for distribution costs.

Thus, on its face, the Agreement evinces the clear intent to require a distribution fee or its equivalent in the form of a royalty for every method of exploiting the Series under the Agreement. Moreover, the Agreement expressly provides for unknown methods of future exploitation. Paragraph 1 states the grant of rights includes distribution "by any means now known or hereinafter invented." Read in conjunction with paragraphs 10.1 and 10.5.A(ii), the Agreement demonstrates the parties' intent to cover any future methods of exploitation, such that future methods would be subject to some distribution fee or royalty, just as are all existing methods of exploitation. Plaintiffs' proffered interpretation is contrary to that intent. Their contention that 100 percent of SVOD and EST revenue should be reported as Gross Receipts without any distribution fee deduction or royalty would cause that revenue to be treated differently from all other

29

revenue. Plaintiffs' construction of the Agreement is both unreasonable and inconsistent with other terms as a matter of law. We have considered plaintiffs' myriad of attacks on the trial court's conclusion and find them all untenable.

## IV. No Basis to Reverse Discovery Sanctions

The parties filed competing motions to compel various types of discovery that were heard before a discovery referee. Buena Vista's May 3, 2019 motion sought to compel Nye's compliance with prior court orders requiring him to produce documents relating to his prelitigation audit. Buena Vista also requested the imposition of $13,937.50 in sanctions. The motion also sought to compel discovery from all plaintiffs.

Following a hearing on June 19, 2019, the referee agreed with Disney "that sanctions are appropriate, but for a lesser sum." The referee reasoned that although "Nye did not produce all of the auditor's workpapers, he did produce several drafts of the audit reports." The referee's report recommended that $10,000 in sanctions be imposed against Nye.

Plaintiffs objected to the referee's report, asserting it "erroneously grant[ed] $10,000 in sanctions in favor of [Buena Vista] and against Plaintiffs, based on Plaintiffs' purported failure to produce documents in contravention of a Court Order as to documents related to a pre-litigation audit." Without comment, the trial court adopted the referee's recommendations in their entirety and denied plaintiffs' request for a hearing.

Plaintiffs now claim the sanctions against Nye should be reversed because their grounds were not identified.

Plaintiffs are not seriously challenging the award of discovery sanctions. If they were, plaintiffs would have opted to file an immediate appeal pursuant to section 904.1, subdivision

(a)(12).  That statute authorizes an appeal from a sanctions award in excess of $5,000.  In any event, the order is reviewable from the final judgment under section 906.  Plaintiffs surprisingly contend the grounds for the discovery sanction were not identified, ignoring the grounds stated in both the referee's report and their own opposition.  Finally, plaintiffs make no attempt to argue the sanctions were not justified for Nye's failure to comply with the court-ordered discovery.  The order is affirmed.

## DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



CHAVEZ, J.

31